[Civ. No. 1880. Fourth Appellate District.—June 25, 1938.]

LLOYD GATES, a Minor, etc., et al., Appellants, v. WENDLING NATHAN CO. (a Corporation) et al., Defendants; R. O. DEACON LUMBER COMPANY (a Corporation) et al., Respondents.

David E. Peckinpah and Harold M. Child for Appellants.

W. H. Stammer, Galen McKnight, Nutter & Rutherford, D. R. Jacobs and Stephen Dietrich for Respondents.

HAINES, J., *pro tem.*—On September 20, 1934, one Elmer Gates, who was at the time superintendent of the pole yard of the San Joaquin Light and Power Corporation at Fresno, was killed in an accident which occurred there in the course of the unloading of a truck and trailer, belonging to respondent R. O. Deacon Lumber Company and operated by respondents Dewey and Farrar. Gates was killed by being pinned between a load of lumber which slipped sideways from off the rear end of the trailer and a pile of cross-arm lumber which lay a few feet away from the trailer on that side.

It appears that the San Joaquin Light and Power Corporation had ordered from the Wendling Nathan Co., of San Francisco, a quantity of cross-arm lumber which was to be shipped by boat to Stockton and there transferred on the premises of the respondent Mid-State Lumber Terminal, a corporation, and the subsidiary of the respondent San Joaquin Lumber Company, to the trucks and trailers of the respondent R. O. Deacon Lumber Company, to be then hauled to Fresno. Respondent Jones is the manager of the Mid-State Lumber Terminal's yard at Stockton. Deliveries were to be made in that manner pursuant to contractual arrangements between the Wendling Nathan Co., the Mid-State Lumber Terminal and the R. O. Deacon Lumber Company. A shipment of cross-arms in lengths of 8, 10, 16 and 20 feet having been, in accordance with these arrangements, received at Stockton, was brought under a crane of the Mid-State Lumber Terminal and there assembled in truck and trailer loads under Jones' supervision by employees of San Joaquin Lumber Company. Dewey was in immediate charge of the truck and trailer here involved and Farrar was his helper. Both were employees of the R. O. Deacon Lumber Company. Dewey drove the truck and trailer under the crane and by the use of the latter, employees of the San Joaquin Lumber

Company, under Jones' direction, proceeded in a single operation to pick up the whole trailer load and place it on the trailer. The trailer had a capacity of about 34,000 pounds. When the trailer was loaded, Dewey, with Farrar's help, chained the load to the trailer bed with a chain on each end of the lumber. The cross-arm material making up the load was of the varying lengths mentioned. On the extreme left side there was on top a group of pieces in dimensions of 4 inches by 6 inches with a length of 20 feet, piled above a group of pieces 4 inches by 6 inches and 16 feet long. Dewey says that he did not notice that there was more weight on the left side of the trailer than on the right. Dewey and Farrar proceeded to drive the truck and trailer, both loaded, to Fresno and into a shed in the pole yard of the San Joaquin Light and Power Corporation where cross-arm stock is kept. This building has a length of about 200 feet from west to east and a width of 60 or 70 feet. A narrow gauge railway runs through the center of the shed the long way. This is double track for part of the distance from west to east and for the rest of the way merges into single track. Dewey drove in from the west and stopped with his trailer straddling the southerly track near the point where the two tracks merge. There were piles of lumber on both sides. On each side of the trailer these were from 6 to 8 feet away from it. The method of unloading the trailer is to dump the load as a whole to the rear. For this purpose various items of equipment are provided. Legs are put down on either side of the frame under the rear end of the trailer to keep the latter from tipping up in front when the load is shifted backward. These legs consist of pieces of pipe about 30 inches long hinged at the top so as to swing down, and when so swung down there are "shoes" at the bottom about 8 inches square. When the legs are let down the shoes hit the rails. The latter are an inch or an inch and a half wide at the top and on either side of the rail is placed a block of lumber to widen the base on which the shoe rests. The rails rest on their own ties. In addition to these legs, the trailer is equipped with a roller at the rear with keepers or bearings at intervals across the back of the truck to keep the roller in place. These are bent inward to confine the roller but do not go completely around it because it is necessary to

keep the top of the roller free. The roller is made to revolve by the use of 4-foot bars that fit into holes at its ends and, by the use of these bars, the load is rolled backward by man-power until when it has been shifted sufficiently to the rear, the trailer is pulled forward so as to release the front end of the load and drop the same to the ground. While this unloading is going on the front chain is released entirely from the load, whereas that in the rear, though free from the rack, is left loosely around the lumber to prevent the load from spreading. After the load has been rolled back about 3 feet the second chain is placed more tightly around it to keep it together when it drops.

On the occasion of the accident, according to Dewey, the deceased, Gates, cautioned him to put this last-mentioned chain about the load, to which he answered ''We always do.'' The two men then walked along the left side of the trailer and truck to the cab of the latter, where Gates signed a tag. Dewey did not, just then, see anything more of Gates, but himself walked to the back end of the trailer and proceeded to roll the lumber off. He found Farrar there rolling the load. It had already been rolled back for the customary 3 feet preparatory to placing the confining chain about it. This was placed there by Dewey and Farrar. Then Dewey started to roll the load on back. Farrar stepped ''along side the trailer about midway of the trailer''. Dewey, in operating the bar in the roller, was standing on the left side of the trailer and about a foot and a half away from it facing ''southeast'', which would mean that he must have been looking diagonally across it toward the front. He was aware of Farrar's presence farther forward on the left side, but noticed nobody between himself and Farrar. His description of what next occurred is as follows:

''As I was rolling the lumber back, and the front end started to leave the trailer bed, I glanced up and seen the load coming towards me. I turned and ran towards the back end of the trailer, of the lumber, and I held my left hand out, and the lumber came over against me. It pushed me away from the lumber, and as I neared the back end of the load, why I was knocked down.''

He says that when the lumber started to come toward him he had ''rolled it back about where it balanced over''. The lumber ''did not start to tip off as it usually does; it started

to raise off the bed of the truck as it usually did, and suddenly, why I just glanced up and it started towards me''. He did not at the time hear any breaking of timber or of anything else. There was no warning to tell him that anything was breaking or coming toward him. The timber that braces the bed of the truck is broken on the left-hand side but he did not hear it crack or break. As he turned and ran back some of the lumber struck him. He had noticed no shifting of the lumber while he was hauling it. When he got up after being knocked down he saw a man ''caught in there''. That was when the load was almost up against the pile of cross-arms to the north. Dewey called to the power men who were running up to drive the truck forward and release the man who was caught, but he actually ran and got into the cab himself and drove the truck ahead ''and the lumber fell down, and when it fell down off the corner of the trailer it straightened up somewhat and it released the man''.

As appears from other testimony, the man turned out to be Gates, and was dead when released.

Farrar testified that he had not noticed Gates' presence. When the load tipped he was a foot and a half to two feet away from the trailer, at about its center on the left side. He was there watching the load slip back. The next thing he remembers is that the load started to come toward him. He heard no noise of cracking or breaking. When he saw the lumber coming toward him he turned and ran. He dodged north through an opening between the piles of cross-arms and ran clear outside the shed. Then he heard Dewey call out that there was a man caught. When the truck was pulled up Gates was released and the power company's employees carried his body out. After the lumber was off Farrar noticed that the beam was broken on the back of the trailer, that is on the left side in the rear. The roller was tipped up in a slanting position.

One Sawyer, a subordinate of Gates, testified that he had given directions to the truck driver (Dewey) just where to stop when he entered the shed. Sawyer was outside the shed at the moment of the accident engaged in carrying out some directions of Gates but came in and helped carry Gates' remains away.

One Brock, garage foreman and equipment man from the San Joaquin Light and Power Corporation, made an examination of the cross sill on the trailer just after the accident to determine what caused it to break. It seems clear that it had broken through some excessive strain or load. With reference to the weight distribution he noticed that there was 20-foot cross-arm material piled on top at the left side of the load which would produce an overhang at the rear end and indicate excessive weight on that side. That was the side where the broken cross sill was. A load so placed would create more weight on the rear of the lumber at the time of unloading than when merely at rest. When at rest the weight will be distributed with some uniformity over all the cross sills of the body. There are two iron braces on each side of the rear end of the trailer chassis with insets in the sill. This he says is not safe construction because whenever any excessive strain is placed on one of these recesses or built-up portions of the sill a break is likely to occur there. Such a break at such a particular point did occur in this instance. Under normal conditions he thinks the roller was safe enough. When loads varied in weight, however, from one side to the other he thinks there should have been some locking device to hold the roller securely to the cross beam. This witness thought the excess length of the 20-foot cross-arms over 16-foot cross-arms produced an overhanging load of about 600 pounds, and that this excess weight on one side was enough to cause the accident. There is, according to him, a greater strain on the back of the trailer in unloading than in transportation.

One Howard, a builder of trailers, testified that the method of installation of the roller adopted by respondent R. O. Deacon Lumber Company is the one generally accepted.

The present action is prosecuted by Gates' heirs, consisting of his widow and two sons, one of whom is a minor appearing by his guardian *ad litem*, to recover the damages sustained by them in consequence of Gates' death. The original complaint was filed on November 1, 1934. The only defendants designated therein by their true names were the Wendling Nathan Co., the R. O. Deacon Lumber Company, Valley Lumber Company, Dewey and Farrar, but there were five fictitiously named defendants sued, and on February 3, 1936, summons was served on respondents Tom Jones, San

Joaquin Lumber Company, W. H. Falconbury and Mid-State Lumber Terminal as constituting defendants originally sued under said fictitious names. Falconbury is president of the San Joaquin Lumber Company. As against these last four defendants, however, who, as just seen, were, if designated at all in the original complaint, designated only by said fictitious names, there was, in the original complaint, no attempt whatever to state any cause of action, all that was therein said about them being that their true names ''are unknown to plaintiffs and plaintiffs sue them by their respective fictitious names as herein set forth and pray that the true names of said defendants, when ascertained, may be inserted herein together with their appropriate charging allegations''. After service, however, of process on these four defendants, the plaintiffs, that is the present appellants, filed on April 9, 1936, an amended complaint in which these defendants, as well as the defendants originally designated by their true names, were all charged in apt terms with negligence proximately contributing to Gates' death. The said four last-named defendants demurred to the amended complaint setting up the bar of subdivision 3 of section 340 of the Code of Civil Procedure and repeatedly moved to strike out the amended complaint in so far as it affected them. Their demurrer was overruled and their motions to strike denied. In their answer they again pleaded the same statute of limitations. The court, however, eventually granted a motion for nonsuit made in their behalf ''by reason of plaintiffs' failure to prove a sufficient cause'' and judgment was entered in their favor accordingly. The court dismissed the case as to the Valley Lumber Company and Wendling Nathan Co. upon hearing the opening statement of counsel for the plaintiffs (appellants) as to what could be proved against them. With respect to defendants and respondents R. O. Deacon Lumber Company, Dewey and Farrar, the case was tried upon appropriate pleadings and a verdict against them in favor of plaintiffs and appellants in the sum of $5,000 rendered, upon which judgment was in due time entered. Plaintiffs and appellants, that is the Gates heirs, appeal from the judgment in their favor as against the three last-named defendants, complaining of its insufficiency and from the judgment of nonsuit entered in favor of Jones, San Joaquin Lumber Company, Falconbury and the Mid-State

Lumber Terminal. No complaint is made of the dismissal of the action as to Wendling Nathan Co. and Valley Lumber Company.

The orders of the trial court overruling the demurrer to the amended complaint of the four respondents, Jones, San Joaquin Lumber Company, Falconbury and Mid-State Lumber Terminal, and denying their repeated motions to strike out that pleading were, of course, mere interlocutory orders and in no way binding on this court in its consideration of an appeal from the judgment of nonsuit, and there is no reason why, in considering whether or not a nonsuit was in order, the applicability of the statute of limitations pleaded may not be here passed on *de novo*. In other words, the trial court's rulings on the demurrer and motion to strike have in no sense become *res judicata*.

The record fails to disclose in detail the grounds upon which the motion for nonsuit in behalf of the respondents Jones, San Joaquin Lumber Company, Falconbury and Mid-State Lumber Terminal was made. The reason assigned by the court for granting it has already been referred to. In our opinion, regardless of the reason that the trial court actually gave for granting the motion, its action must, in so doing, be sustained for the reason that appellant's right to maintain this action against all or any of these four respondents is clearly barred by subdivision 3 of section 340 of the Code of Civil Procedure fixing one year as the limit of time within which an action may be commenced for the death of one caused by the wrongful act or neglect of another. It is settled that when a defendant has pleaded the bar of the statute of limitations a motion for nonsuit must be granted if the evidence shows the action to be barred. (*Beeson* v. *Schloss,* 183 Cal. 618 [192 Pac. 292]; *Bass* v. *Hueter,* 205 Cal. 284 [270 Pac. 958]; *Wrightson* v. *Dougherty,* 5 Cal. (2d) 257 [54 Pac. (2d) 13].) Regardless, therefore, of what the trial court's theory was in granting the motion for nonsuit, the circumstance that as against these four respondents the statute of limitations constitutes a bar is sufficient reason for sustaining the judgment.

These respondents make the point that the record shows that they were not parties whom appellants, when they filed the action, had in mind at all as possible defendants, that the permission given by section 474 of the Code of Civil

Procedure to sue parties whose names are unknown, by fictitious names, and to later amend by substituting their true names, ought to be held to authorize such substitution only when, in filing the case, the identity of the intended defendant is known and only his name unknown. (Citing *Town of Hancock* v. *First Nat. Bank of Oxford,* 93 N. Y. 82, 85.) This is a most interesting question, but we do not think it necessary for us here to determine it. Assuming, without deciding, that these four respondents can be treated as having been persons originally sued herein under fictitious names, the fatal weakness in appellants' present effort to pursue them is that until after the bar of the statute of limitations had been interposed no attempt whatever was made to state a cause of action against all or any of them. We are not, of course, unmindful of the settled rule that a *bona fide* attempt to state a cause of action against a party, which fails by reason of some imperfection, may be remedied by amendment so that the amended pleading will relate back to the date of the filing of the original defective pleading and avoid the running of the statute of limitations in the *interim* (*Ruiz* v. *Santa Barbara Gas & Elec. Co.,* 164 Cal. 188, 194, 195 [128 Pac. 330] ; *Rauer's Law etc. Co.* v. *Leffingwell,* 11 Cal. App. 494 [105 Pac. 427]), but we have yet to read of a case where the running of the statute has been held to be avoided by filing a complaint wherein a defendant is designated by a fictitious name and the only allegations as to him are that the plaintiff is ignorant of the defendant's true name and, when he knows it, will amend by substituting it, and at that future time make some charge against such defendant. Yet that seems to us precisely what appellants, as to these four defendants, have attempted here. If procedure of that description can be tolerated, all statutes of limitation might as well be at once and forever repealed. The further contention that the statute has not here run because one of the plaintiffs is a minor is squarely answered by the opinion of this court in *Haro* v. *Southern Pac. R. R. Co.,* 17 Cal. App. (2d) 594, 595 [62 Pac. (2d) 441], following *Sears* v. *Majors,* 104 Cal. App. 60 [285 Pac. 321]. In our opinion the foregoing considerations are decisive of the present appeal in so far as the four respondents referred to are concerned and no useful purpose would be served by pursuing the inquiry as to what their liability

might or might not have been had appellants seasonably attempted to state a cause of action against them.

No appeal has been taken by the defendants R. O. Deacon Lumber Company, Dewey and Farrar or any of them from the $5,000 judgment entered in pursuance of the jury's verdict against them, but the only appeal from that judgment is taken by the plaintiffs. ■ Their complaint, in so far as these respondents are concerned, is that the award of damages was inadequate. The record shows that plaintiffs and appellants, before taking their appeal, moved the court for a new trial and that their motion was denied. Two of the grounds stated in their notice of motion were "insufficiency of the evidence to justify the verdict" and "insufficiency of the evidence to justify the verdict in that said damages awarded were inadequate". These three last-named respondents now make the point that the evidence is insufficient to have justified any verdict establishing any liability against them and that for that reason the damages awarded against them cannot possibly be inadequate. As indicating the proper course to be taken in these circumstances by the court appellants refer us to the case of *Lambert* v. *Kamp*, 101 Cal. App. 388 [281 Pac. 690], where the judgment was, for the reason given, affirmed, and to the case of *Bencich* v. *Market Street Ry. Co.*, 20 Cal. App. (2d) 518 [67 Pac. (2d) 398]. The last-mentioned case was one in which, though a motion for new trial had been denied below, the Appellate Court deemed the record to show that the jury must have fixed damages that were inadequate, not from considering the extent to which the appellant was damaged, but through some compromise between the views of persons who believed that the respondent was not to blame for the injury at all, and those who believed it liable and would, but for such compromise, have fixed the award at a sum commensurate with the damages shown. In that case the inadequacy of the award was clear from the circumstance that so much of it would obviously be accounted for by the special damages shown, as to leave an unsubstantial sum to cover the general damages. In these circumstances the judgment was reversed and the case remanded to the superior court for retrial on all the issues joined.

This court has recently had occasion in *Wallace* v. *Miller*, 26 Cal. App. (2d) 55 [78 Pac. (2d) 745] (hearing denied

by Supreme Court on June 16, 1938), and in *Zeller* v. *Reid*, 26 Cal. App. (2d) 421 [79 Pac. (2d) 449], to discuss the bearing of *Bencich* v. *Market Street Railway Co., supra*, as respects the course to be taken when a plaintiff, after denial in the superior court of his motion for new trial, has on appeal urged the insufficiency of the damages awarded. In *Wallace* v. *Miller, supra*, it was mathematically demonstrable from the fact that the award was in the exact amount of only one of the items of special damage proved, that the jury had ignored other special damages shown without conflict in the evidence and had made no award of general damages at all, although these too had appeared without conflict to have been sustained. This court held that in these circumstances there had manifestly been no agreement on the question of liability but some compromise on that subject resulting in a verdict which, if there were any liability, was plainly inadequate. In that situation a retrial upon all of the issues was ordered. However, in that connection this court said:

"We find nothing in the case of *Tripcevich* v. *Compton*, 25 Cal. App. (2d) 188 [77 Pac. (2d) 286], that necessarily conflicts with the conclusions we have reached. The court there merely held that on the record before it the trial judge did not abuse his discretion in granting a new trial on the question of damages only.

"As far as appears from that opinion the damages awarded were general and there were no special damages involved, especially special damages concerning the amount of which there was no controversy. Setting the amount of general damages involves an exercise of a rather broad discretion on the part of the triers of fact in reaching a just conclusion as to the amount that will compensate an injured party for the loss suffered. This is a question upon which there is often, we might be justified in saying, frequent, divergence of honest opinion in cases where there might be no difference of opinion on the question of liability. While the amount of general damages awarded should always have a reasonable relation to the loss suffered, there of necessity can be no fixed rule of the exact measure of general damages to be awarded for somewhat similar injuries. The facts of each case and the sound discretion of the triers of fact should be permitted to govern the award of general damages in

practically all cases. It is only in a case where the amount of the award of general damages is so disproportionate to the injuries suffered that the result reached may be said to shock the conscience, that an appellate court will step in and reverse a judgment because of greatly excessive or grossly inadequate general damages.''

In *Zeller* v. *Reid, supra,* this court had before it a situation wherein a jury had awarded damages in the sum of $1,000 to a plaintiff for the death of her minor son. This court there said:

''We can find nothing in the evidence that would force the conclusion that the verdict in this case was the result of a compromise on the part of the jurors or indicating that some of them had surrendered their views on the questions of the negligence of defendants and the contributory negligence of Harold merely for the purpose of bringing in a small verdict under the rules announced in *Donnatin* v. *Union Hardware & Metal Co.,* 38 Cal. App. 8 [175 Pac. 26, 177 Pac. 845], *Bencich* v. *Market Street Ry. Co.,* 20 Cal. App. (2d) 518 [67 Pac. (2d) 398], and *Wallace* v. *Miller,* 26 Cal. App. (2d) 55 [78 Pac. (2d) 745]. Rather it falls within the rule adhered to in *Tripcevich* v. *Compton,* 25 Cal. App. (2d) 188 [77 Pac. (2d) 286]. The two lines of decisions are not conflicting and can be readily harmonized. (See *Wallace* v. *Miller, supra.*) Under the rule of the Tripcevich case the trial judge exercised a reasonable discretion in granting a new trial on the question of damages only.''

In the instant case the only item of special damages shown was $414, incurred for funeral expenses of the deceased. While the verdict does not specifically mention this item, it may be assumed to have been included in the $5,000 of damages awarded. This would have left $4,586 as the amount of general damages allowed. While it must be admitted that the allowance was not a liberal one, it is hardly so trivial that it can be said to shock the conscience or to require us to hold that in allowing it to stand the trial court abused its discretion.

For the reasons given the judgment of nonsuit is as to the defendants Jones, San Joaquin Lumber Company, Falconbury and Mid-State Lumber Company affirmed and the judgment entered upon the verdict is, as to the defendants

R. O. Deacon Lumber Company, Dewey and Farrar, also affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on July 23, 1938, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 22, 1938.