[Civ. No. 33794. First Dist., Div. One. Oct. 16, 1975.]

PACIFIC COAST REFRIGERATION, INC.,
Plaintiff and Respondent, v.
DOUGLAS BADGER et al., Defendants and Appellants.

**COUNSEL**

John A. Klein for Defendants and Appellants.

Graves & Mallory and Roland Mallory for Plaintiff and Respondent.

**OPINION**

**THE COURT.**\*—Defendants have appealed from a judgment ordering foreclosure of a mechanic's lien asserted against a parcel of land in which they hold title of record as joint tenants. They contend that the land, which was part of the whole of a planned shopping center, is not required for the convenient use and occupation of another portion of the

---

\*Before Molinari, P. J., Sims, J., and Elkington, J.

proposed shopping center on which is situated the work of improvement to which the plaintiff contributed work, labor and materials. The defendant Florence Badger further contends that the plaintiff failed to take proper steps to perfect any lien rights against her interest as co-tenant in the property.

An examination of the record indicates that the findings of fact and the conclusions of law and judgment of the trial court cannot be sustained in material particulars. The judgment must be reversed and the case must be remanded with instruction to enter judgment for the defendants.

The facts are not greatly disputed. It is only the legal conclusions to be drawn therefrom that give rise to the controversy. The uncontradicted facts applicable to both issues, most of which are embraced in the findings of the trial court, are as follows:

On December 11, 1957, a deed was recorded conveying to "Douglas Badger and Florence Badger, his wife, in Joint Tenancy" five acres of land, more or less, bounded on the west by a railroad right of way, on the south by Dry Creek Road, and on the east by Healdsburg Avenue. By deed recorded September 13, 1965 the Badgers conveyed away the northerly 2.12 acres of the property. They were left with a parcel that measured, according to the description in the lease referred to below, upon which description plaintiff rests its claim, 336.50 feet on the east along Healdsburg Avenue, 389.15 on the north along the boundary of the land conveyed away, 333.11 feet on the west along the railroad right of way, and 364.20 feet on the south along Dry Creek Road. It contained 2.89 acres.

On August 26, 1966, the Badgers, in contemplation of leasing the southeast corner for a service station recorded a record of survey map of the property which reflected a square parcel roughly 150 feet on each side of the intersection at the southeast corner.

On June 1, 1966, "Douglas Badger, and Florence Badger, his wife," as "Landlord" leased all of their remaining property, including the proposed service station site, to "W. S. Lee" as " 'Tenant.' " On July 29, 1966, a "Memorandum of Lease," executed and acknowledged by each of the foregoing parties and containing a legal description of the property by metes and bounds, was recorded.

On March 22, 1967, a deed was recorded conveying strips of land along Healdsburg Avenue and Dry Creek Road to the City of Healdsburg, apparently for street widening purposes. On July 18, 1967, a deed of trust executed on May 26, 1967, by William S. Lee and Patsy P. Lee, his wife, and Douglas Badger and Florence Badger, his wife, was recorded. The Badgers joined in executing the deed of trust in accordance with a subordination agreement contained in the lease. This deed of trust covered 0.644 acres of the total property described by metes and bounds. This site is identified as "Building Site" on an exhibit produced for identification by the defendants and appears on other title company plats which are in evidence. In addition to that property, the trustors conveyed a nonexclusive easement for parking, driveway, walkway and common areas over all of the remainder of the property *except* a rectangular parcel in the southeast corner with interior dimensions of 110 feet east and west parallel to Dry Creek Road, and 140 feet north and south parallel to Healdsburg Avenue. It is this excepted parcel and the fee underlying the easement which are the subject of dispute in this action.

The record reflects, and the court found that W. S. Lee, the tenant under the lease from the Badgers, subleased the property to Lee Bros. Value World, Inc., a California corporation, for the purpose of the construction of a shopping center. The sublessee had plans drawn up for the construction of a shopping center which was to include a supermarket, a service station, building space for other stores and a large parking lot and common area. Lee Bros. Value World, Inc. entered into a contract with Page Construction Company for the construction of the supermarket, and further entered into two separate contracts with plaintiff, Pacific Coast Refrigeration, Inc., a California corporation duly licensed to perform refrigeration and general contracting services, for the engineering and installation of a refrigeration underground and an air-conditioning underground in the supermarket element of the shopping center. During the period from August 1, 1967, to October 1, 1967, the plaintiff provided labor and materials to the supermarket job site in an amount in excess of its claim. On September 27, 1967, a bankruptcy petition was filed for Lee Bros. Value World, Inc.

On October 10, 1967, plaintiff sent its invoice in the amount of $12,240 to the sublessee, with whom it had contracted and a copy to defendant Douglas Badger. A certified mail receipt shows that pursuant to the provisions of section 1193 of the Code of Civil Procedure, a prelien notice was mailed to "Doug Badger," "Redwood Electric Co., Owner or Reputed Owner" and was delivered to "Redwood Electric K. M.

Badger" October 26, 1967. On December 18, 1967, plaintiff recorded its "Claim of Lien" for $12,240. It refers to the property as follows: "That parcel of land in the County of Sonoma described in the Memorandum of Lease dated June 2, 1966 and recorded June [*sic*, July] 29, 1966 in Book 2223 of Official Records of Sonoma County at page 308." It recites, "That the name of the owner and reputed owner of said property is Doug Badger, Redwood Electric Company." On March 11, 1968, plaintiff filed this action against "Doug Badger, individually and doing business as Redwood Electric Company, Redwood Electric Company, a Corporation, Lee Bros. Value World, Inc. and Does One through Doe Ten." The complaint alleged that the whole of the property described in its claim of lien is required for the convenient use and occupancy of the building and improvements to which the plaintiff furnished materials, equipment and labor.

Under the threat of the Bank of America foreclosing its deed of trust, plaintiff and defendants in effect worked together to see if their respective interests in the land could be salvaged. While working together, plaintiff and plaintiff's attorneys, and defendants and defendants' attorneys did not realize that the Bank of America deed of trust did not cover the entire property subject to plaintiff's claim of lien. The Bank of America assigned its beneficial interest in the deed of trust to Borden, Inc., and that deed of trust was foreclosed by sale to the assigned beneficiary and a trustee's deed to Borden, Inc. conveying the portion of the premises the subject of the deed of trust was recorded December 23, 1969.

In January 1972 plaintiff engaged and substituted new attorneys in the case. They discovered the true names of the owners of record, and that they owned the underlying fee to the parking lot easement and that the service station corner had not been subject to the deed of trust. On May 16, 1972, defendant "Doug Badger, individually and doing business as Redwood Electric Company," filed an answer to the original complaint in which for lack of information and belief he denied the allegation relating to the materials, equipment and labor supplied by the plaintiff and the amount due therefor. He alleged as affirmative defenses that the plaintiff had failed to give preliminary notice of his claim as required by section 1193 of the Code of Civil Procedure, and that plaintiff had failed to record its claim of lien in timely manner. By failure to deny he admitted the allegation concerning the description of the property involved and that it was required for the convenient use and occupancy of the building.

On August 9, 1972, after its motion to file an amended complaint was granted, the plaintiff filed an amended complaint to foreclose a mechanic's lien against "Doug Badger, Florence Badger, his wife, and Does One through Ten." Following the interposition of a demurrer by the defendant Florence Badger a second amended complaint to foreclose a mechanic's lien was filed containing allegations aimed at emasculating certain special defenses asserted by her. (See part II below.) In their answer to this complaint the Badgers denied that the whole of the property against which plaintiff made claim was required for the convenient use and occupancy of the building.

Other facts relating to the special defenses of the defendant Florence Badger are alluded to in part II.

I

The heart of the controversy revolves about the provisions formerly found in section 1183.1 of the Code of Civil Procedure (Stats. 1951, ch. 1159, § 1, p. 2492) and now restated in section 3128 of the Civil Code (Stats. 1969, ch. 1362, § 2, p. 2763, operative Jan. 1, 1971) reading as follows: "The liens provided for in this chapter shall attach to the work of improvement and the land on which it is situated *together with a convenient space about the same or so much as may be required for the convenient use and occupation thereof,* if at the commencement of the work or of the furnishing of the materials for the same, the land belonged to the person who caused such work of improvement to be constructed, but if such person owned less than a fee simple estate in such land then only his interest therein is subject to such lien, except as provided in Section 3129." (Italics added.)[1]

---

[1]Civil Code section 3129 (Stats. 1969, ch. 1362, § 2, operative Jan. 1, 1971) provides: "Every work of improvement constructed upon any land and all work or labor performed or materials furnished in connection therewith with the knowledge of the owner or of any person having or claiming any estate therein shall be held to have been constructed, performed, or furnished at the instance of such owner or person having or claiming any estate therein and such interest shall be subject to any lien recorded under this chapter unless such owner or person having or claiming any estate therein shall give a notice of nonresponsibility pursuant to Section 3094."

Similar provisions were contained in former section 1183.1 of the Code of Civil Procedure. (See *M. Arthur Gensler, Jr., & Associates, Inc.* v. *Larry Barrett, Inc.* (1972) 7 Cal.3d 695, 707 [103 Cal.Rptr. 247, 499 P.2d 503].)

In this connection the lease provided:

"Tenant shall use his best efforts to develop as expeditiously and fully as is reasonably possible in the exercise of good business judgment a small shopping center upon the premises, including a commercial lease with Lee Bros., Value World Inc. super-market chain. Tenant shall have the right during the lease term to demolish, replace, alter

The trial court found:

"31. The whole property described in plaintiff's claim of lien was to be developed as an entirety so that each portion would attract customers and provide conveniences for customers of the entire enterprise; the supermarket was to be called Lee Bros. Value World and the service station was to be called Value World Automotive Service Center.

"32. At all times, the entirety of the property described in plaintiff's lien was, and now is, necessary and convenient to the use and occupancy of the job site upon which plaintiff bestowed its materials and labor."

Defendants contend that the second finding is unsupported by the evidence, because, although the whole of the premises might be convenient for the use and occupancy of the supermarket, the service station site, as distinguished from the parking, driveway, walkway and common areas over which the lender took an easement, was not necessary or required for such convenient use and occupancy.

At the outset defendants are met with the general rule that all intendments are in support of the findings of the lower court. ". . . an appellate court will view the evidence in the light most favorable to the respondent and will indulge in all intendments, and reasonable inferences to sustain the findings and the judgment." (*Gyerman* v. *United States Lines Co.* (1972) 7 Cal.3d 488, 492, fn. 1 [102 Cal.Rptr. 795, 498 P.2d 1043]. See also *Thompson* v. *City of Long Beach* (1953) 41 Cal.2d 235, 246 [259 P.2d 649]; and *Mayo* v. *Pacific Project Consultants, Inc.* (1969) 1 Cal.App.3d 1013, 1020 [82 Cal.Rptr. 117].) More specifically, as stated in the opinion adopted in *Anselmo* v. *Sebastiani* (1933) 219 Cal. 292 [26 P.2d 1], " 'Determining the area of land that shall be included in

---

structually or otherwise, and make any new construction with respect to any buildings and/or other improvements and equipment, now or hereafter on said premises, same to be completed free of mechanics liens. Tenant shall require general contractor constructing improvements to obtain surety company bonds insuring completion of improvements including Landlord as an additional obligee thereunder. Landlord shall join in applications, but not pay fees, for permits as may be required by governmental agencies and grants of easements as may be required by public utilities. At least ten (10) days prior to commencement of any construction, Tenant shall notify Landlord thereof in writing so that Landlord may post such notices of non-responsibility as Landlord may desire."

On the same day that the deed of trust was recorded, a corporate surety covering the obligations of the general contractor was recorded. No notice of nonresponsibility was given by the Badgers, and apparently plaintiff's contract with the sublessee was separate and not covered by the contract bond.

the order of sale upon the foreclosure of a lien for the erection of a building, is largely within the discretion of the trial court, and unless abused, will not be disturbed. . . . The arguments of the appellants herein appear to be based upon the theory that all the land that can be included in an order of sale is only such as may be required for ingress and egress. As stated, the land required is a question of fact to be determined by the trial court. [Citation.]' " (219 Cal. at pp. 297-299. See also *California Corrugated C. Co.* v. *Stewart* (1932) 215 Cal. 120, 122 [8 P.2d 1013]; and *Green* v. *Chandler* (1880) 54 Cal. 626, 627.)

There is evidence, to support the facts recited in finding number 31. The 55-year lease contemplated the development of a small shopping center upon the premises. (See fn. 1 above.) In connection with the plans for the specific work it was to do, plaintiff produced and introduced into evidence a grading and drainage plan for the entire area, prepared by the sublessee's architect and superimposed over a topographic map. This plan was entitled "Healdsburg Shopping Center." On it were areas designated as "Service Station," "Lee Brothers Market" and "Future Stores." Another plan, referred to as an architectural site plans and details, showed the parking lot details, the parking lot lights, the striping and the curbs for the shopping center. It also designated a site for a service station. Other plans showing the details for the market also bore the imprint "Healdsburg Shopping Center." An electrical site plan of the overall shopping center was entitled "Healdsburg Shopping Center, Lee Brothers Market, Sonoma County California." It also showed sites for the market, future stores and a service station. A general plumbing plan for the entire shopping center was of similar import.[2]

Plaintiff's president testified that he had assisted Mr. Lee and Lee Brothers in the design of the functioning seven or eight supermarkets, and that Mr. Lee had requested his advice on the layout of the shopping center. In his conversation Mr. Lee told the president that he planned to build a "Value World Center" on the site with an automotive service

---

[2]These plans were only part of a large bundle which contained architect's plans for specific elements of the market. Insofar as plaintiff was concerned, it apparently participated in the preparation of plans which identified the fixtures, and their location and dimensions in the market itself, and plans which showed its necessary electrical connections and a breakdown of the loads for the equipment needed to run the store. It was concerned with plans for the electrical circuitry, plumbing requirements, the dimensions and identification of all of the refrigeration connections and equipment, and the details of the services of the market. Other plans and drawings for which plaintiff furnished data to the architect involved the location of the equipment, details of refrigeration equipment, including walls in coolers and freezers, revisions of the foregoing plans, and plaintiff's drawing of the air-conditioning systems for the market.

facility and dry goods department tied into conjunction with the store, and that the service station would be called "Value World Auto Service Center."

The record also establishes that the construction of the supermarket and the adjacent parking lot were disassociated, not only from the construction of a proposed department store, apparently on an adjacent site, included in the property subject to the deed of trust, but also from the proposed construction of the service station on a separate site.

At the time of trial, February 28, 1973, the market, insofar as it was completed, had never been occupied or put to use. Adjacent to it was a portion of ground which had been graded level and prepared for future building. A portion of the premises reserved for use as a parking lot had been paved and furnished with typical parking lot lights. Driveways had been constructed into the parking lot from the two adjacent streets, and it was useable and used for vehicular traffic.

The service station site, which had been excepted from the property subject to the deed of trust, had been leveled, but it was unimproved and was covered with grass. It was separated from the remainder of the property by a basalt block retaining wall on the inside boundaries and for the most part was at a different grade than the parking lot. No driveways had been constructed from the service station site to either of the two adjacent intersecting streets. The parking lot was developed for the entire prospective development, that is the building which was erected and other proposed stores, but not specifically for the use of the service station. On the completion of the work that was accomplished, a large space was left in the center of the basalt block wall for ingress and egress between the parking lot area and the service station site, but it was closed off by posts, which were indicated on the plans for the supermarket as "Temporary Barrier." At the time of trial it was impossible to drive from one location to the other.

Finding number 32 can only be considered as a mixed finding of ultimate fact and a conclusion of law. The particular facts being undisputed, the matter then became a question of law. Plaintiff points out that the mechanic's lien law is remedial in character, and should be liberally construed in its entirety with a view to effect its objects and to promote justice. (See *Hendrickson* v. *Bertelson* (1934) 1 Cal.2d 430, 432 [35 P.2d 318].) It has been noted that there was frequent amendment of the lien laws at earlier sessions of the legislature (see *Booth* v. *Pendola*

(1891) 88 Cal. 36, 42 [23 P. 200, 25 P. 1101]) and that "the amending process has been one of liberalization in favor of those who bestow services on the structure or land." (*Nolte* v. *Smith* (1961) 189 Cal.App.2d 140, 144 [11 Cal.Rptr. 261, 87 A.L.R.2d 996].) This does not mean, however, that the mechanic should get more than his due, or more than he had a right to anticipate he would have received upon default of the contracting party.

Each side recognizes that the statute directs consideration of the nature of the "use and occupation" of the structure for which the labor and materials were furnished, or as phrased in *Anselmo* v. *Sebastiani, supra,* 219 Cal. 292, " 'The determination of this area must take into consideration the intended use for which the building is erected. If erected for the purposes of use as a separate and distinct unit, then the area of land required for its convenient use may properly be limited only to an area necessary for ingress and egress, but if its use is dependent upon, and connected with the uses made of other buildings or the uses made of other portions of the tract of land upon which it is situate, then if all of the larger tract is required for the "necessary and convenient use" of the building involved, such larger tract may properly be included in the order of sale.' " (219 Cal. at pp. 297-298. See also *Cowan* v. *Griffith* (1895) 108 Cal. 224, 226 [41 P. 42]; and *Tunis* v. *Lakeport A. P. Ass'n.* (1893) 98 Cal. 285, 286 [33 P. 63, 447].) Or, as stated in *Springer Land Association* v. *Ford* (1897) 168 U.S. 513 [42 L.Ed. 562, 18 S.Ct. 170], "The truth is that what area of land is subject to lien in a given case largely depends on the character of the improvement." (168 U.S. at p. 530 [42 L.Ed. at p. 567]. See also *Gregg* v. *H. & M. Drilling Co.* (1928) 92 Cal.App. 189, 191-193 [267 P. 903]; and *Western W. Wks.* v. *California F. Co.* (1923) 60 Cal.App. 749, 756-758 [214 P. 491].)

Defendants concede that the use and occupation of a building designed and intended for a supermarket requires for its convenient use and occupation the easement, for parking, driveways, walkways and common areas, which was the subject of the deed of trust, and was thereafter, with the work of improvement, lost, to both owner and lienholder, by the foreclosure.

In support of the finding, conclusion and judgment of the trial court, plaintiff relies upon *Anselmo* v. *Sebastiani, supra,* and *W. R. Spalding Lbr. Co.* v. *Fradkin* (1945) 68 Cal.App.2d 308 [156 P.2d 450]. In the former case, the lien for the obligations arising from the construction of an auxiliary building to store the by-products from winemaking was

granted with respect to the five other buildings used in connection with the winery, and the eight acres upon which all stood. The court found that the use and occupation of the new structure was "dependent upon, *and* connected with the uses made of other buildings or the uses made of other portions of the tract of land upon which it is situate, . . ." (219 Cal. at p. 298, italics added.) It noted, " 'The purpose for which the building in question was erected is so intimately and directly connected with the operations carried on in the adjacent buildings as to constitute it an essential part and parcel of the plant known as the "Woodbridge Winery". The work carried on in the preserving house could not be carried on disconnected with the processes conducted in the other buildings. Nor could the complete process of extracting all of the commercial elements from the grapes crushed be completed in the adjacent buildings without the use of the preserving house.' " (*Id.,* p. 299.)

In the latter case the court affirmed a judgment which gave the lien claimant a lien on an entire 20-acre ranch, stating, "Finally, it is contended that the court erred in imposing a lien upon the entire 20 acres owned by the appellants rather than upon a portion thereof. There is evidence that this dwelling was built because it was necessary to the operation of the ranch and for the purpose of improving and benefiting the entire 20 acres. No abuse of discretion appears. [Citations.]" (68 Cal.App.2d at p. 314. See also *California Cor. Culvert Co.* v. *Stewart* (1934) 220 Cal. 104, 106-107 [29 P.2d 412]. Cf. *Tunis* v. *Lakeport A. P. Ass'n., supra,* 98 Cal. 285, 287; and *Cowan* v. *Griffith, supra,* 108 Cal. 224, 226, as both are discussed below.) The *Fradkin* case, perhaps erroneously, applies the principle properly applied to structure or other works of improvement which are designed and constructed to be of use and benefit to the improvements and land which are adjacent. Examples are: the grain elevator and barn expressly constructed for handling the crop of a 729-acre rice ranch *(California Cor. Culvert Co.* v. *Stewart, supra),* the preserving house building which was an integral part of the winery *(Anselmo* v. *Sebastiani, supra),* the well to irrigate two sections of land *(Western W. Wks.* v. *California F. Co., supra),* and the irrigation system serving 22,000 acres *(Springer Land Association* v. *Ford, supra).* Here the supermarket was neither dependent on nor connected with the proposed service station operation, nor would it more than incidentally benefit such an operation.

The fundamental fallacy in plaintiff's argument, which has apparently been overlooked by both parties and the court below, is that it assumes

that there is an adjacent service station to which its overall claimed lien (a part having been cut off by foreclosure) would run. There is no service station to which plaintiff's claimed lien can extend. (Note, *Humboldt Lumber Mill Co.* v. *Crisp* (1905) 146 Cal. 686, 687-689 [81 P. 30]; and cf. *McIntosh* v. *Funge* (1930) 210 Cal. 592, 601-602 [292 P. 960, 74 A.L.R. 420].) The question properly phrased is: Does the convenient use and occupation of a supermarket, with an appropriate easement for parking, driveway, walkway and common areas, require an additional parcel of approximately 110 feet by 140 feet so that a service station can be constructed on that parcel to attract customers and provide conveniences for the customers of the supermarket? The answer is obviously, no. The lenders under the construction loan, who undoubtedly had a lot more at stake than the plaintiff contractor, apparently also concluded that the supermarket project could properly be financed without the addition of a service station site.

It may be argued that in view of the evidence the court properly considered the whole of the proposed shopping center as "the land on which ['the work of improvement'] is situated together with a convenient space about same" under the statutory provision. That concept presents certain difficulties where, as here, the work is not undertaken all at once under one general contract. When the development is by stages, on separate plots, the granting of lien on the whole to anyone who contributes labor or material to a particular unit could result in encumbering the entire project because of the default of one tenant or concessionaire. Moreover, it could lead to serious conflicts.

Assume that the supermarket and the service station were constructed contemporaneously but under separate contracts, separately financed on separate plots, and that there was resulting financial embarrassment. If there was an equity left in the supermarket but all interests in the service station had been lost by foreclosure, the refrigeration contractor should not be required to share his lien with those who constructed the service station.

It is important to note that this is not a dispute between a contractor and a landowner or lender who has received an economic benefit from the labor and materials furnished by the contractor. (Cf. Civ. Code, § 3264 and discussion, *Boyd & Lovesee Lumber Co.* v. *Modular Marketing Corp.* (1975) 44 Cal.App.3d 460, 463-466 [118 Cal.Rptr. 699].) The developer's default has left both losers. Plaintiff lost his labor and materials; the defendants lost about five-sixths of their land. It is neither

equitable, nor required for the convenience of the lienholder that the latter be given a lien on this parcel designedly exempted from that pledged for the sums to construct the supermarket.

If the case is examined, as it has been presented, from the viewpoint of an existing service station, there is still no merit in plaintiff's contention. Although in this case there may be a connection between the use and occupation of the new supermarket and a service station, there is no showing that the use and occupation of the former is dependent upon the latter. (Cf. *Anselmo* v. *Sebastiani, supra,* 219 Cal. 292, 298.) *W. R. Spalding Lbr. Co.* v. *Fradkin, supra,* insofar as it indicates a dwelling, was necessary for the ranch and therefore the entire ranch may be subject to a lien, is contrary to the statements uttered by the Supreme Court of this state in *Tunis* v. *Lakeport A. P. Ass'n., supra,* (98 Cal. at p. 286) and in *Cowan* v. *Griffith, supra,* (108 Cal. at p. 226). Here the plaintiff has failed to show that the supermarket was necessary for the reserved site of the service station.

In support of their position, that the service station site was not required for the convenient use and occupation of the supermarket, defendants rely upon *Tunis* v. *Lakeport A. P. Ass'n., supra.* There the trial court had failed to take evidence on the issue of how much land was actually required for the convenient use and occupation of the building housing a hotel, clubhouse and saloon which was the work of improvement. In reversing a judgment which had granted a lien on the whole of a 60-acre agricultural park with race track, grandstand and stables, the court made the following observation, " . . . This thing should be borne in mind, it is for the *convenient use and occupation* of the building that the land about the same is given by our statute; a flouring mill erected upon a large grain ranch would require a given space around it for the purposes incidental to its operations; it might require the whole ranch to create business for it, but it would not follow, under our statute, that the entire ranch would be subject to a lien for its erection." (98 Cal. at pp. 286-287.) With respect to the issue at hand it stated, "In the present case it is easy to see that the race track with its training stables, grand stand, corrals, and other improvements, may be necessary to create business for the hotel, clubhouse, and saloon, for which the building in question was constructed, but it is not at all apparent that they are necessary to the convenient use and occupation of the building for the purposes indicated. Their uses are foreign to its purposes, except as they may tend to bring custom to its doors." (*Id.* p. 287.) So here a service station if and when it might be constructed is not necessary to the convenient use and

occupation of a supermarket. Its sole relationship is that its customers might be attracted to shop at the supermarket because of the latter's proximity, or conversely, that customers might prefer to shop at the supermarket because there was a convenient service station nearby. The service station's use is foreign to the supermarket use except as it might "tend to bring custom to its doors."

Plaintiff seeks to distinguish *Tunis* on the ground that it failed to appreciate and apply the principle that the lien law, being remedial in character, should be liberally construed. As we have seen that principle does not give a license to subject more property to the lien than is authorized by law. Plaintiff further asserts that the views outlined above are dicta because the case was remanded for further trial. It is clear that the court intended, "to indicate the basis upon which, under our code, a conclusion is to be reached in consonance with the requirement of the law." (98 Cal. at p. 287.)

The principles enunciated in *Tunis* have been applied in other circumstances.

In *Macomber* v. *Bigelow* (1899) 126 Cal. 9 [58 P. 312], the court ruled: "In this case the work for which liens were filed was all done and furnished on and for the new building of 'eight flats'; the liens filed by Madigan and Tuttle were therefore properly confined to the lands necessary and convenient to the use and occupation of that particular building, and, the court having the power so to do under section 1185 of the Code of Civil Procedure, properly restricted the lien of Depuy to the same premises. There was nothing to show that the rear portion of the lot, covered by the old buildings, was in any way convenient or necessary to the use of the new building. Though the original contract embraced other buildings, the liens were properly confined to the building upon which the work was done. [Citation.]" (126 Cal. at p. 12.)

In *Cowan* v. *Griffith, supra,* the court reversed judgment foreclosing liens for obligations incurred in the construction of a dwelling house on the whole of a 40-acre farm. The court concluded, "And here it may be said the use of this land is foreign to the owner's purposes, except that it may furnish him an income by which he may sustain himself in the dwelling. The statute simply allows him the dwelling-house and a quantity of land around it sufficient for its convenient use. As to his income or source of support, the statute does not concern itself." (108 Cal. at p. 226.) So in this case the court should not concern itself with

extrinsic factors which might contribute to the support of the supermarket. A similar result was reached in *Gregg* v. *H. & M. Drilling Co., supra.* There the court refused to extend a lien for the construction of a driveway to an oil well drilling site to all of a five-acre tract of land subject to an oil lease. The court stated, "It is not the use to which the land was to be put that adjoins the improvement that determines the extent of the lien, but rather the use for which the improvement was constructed. In the cases cited by respondent involving the construction of wells and irrigation systems, the uses for which the improvements were constructed determined the extent of the liens. In the instant case, the improvement was constructed for the use of vehicles and pedestrians." (92 Cal.App. at p. 193.)

The record fails to sustain any finding that the entirety of the property described in plaintiff's claim of lien was or now is required for the convenient use and occupancy of the land on which the work of improvement upon which plaintiff bestowed its materials and labor is situated. It shows that the proposed service station site is not so required. The judgment must be reversed.

## II

In the light of the foregoing conclusion it should be unnecessary to resolve the further question with respect to whether the steps taken by plaintiff to assert its lien reached the interest of the defendant Florence Badger in the property. Nevertheless the following comments are pertinent to the findings and conclusions of the trial court as they stand of record.

From the facts recited above it is clear that the plaintiff failed to give a prelien notice to defendant Florence Badger who appeared of record as a co-tenant of the property, it failed to name her in its claim of lien, and it failed to name her as a defendant in the action until long after the statute of limitations had run on an action to foreclose its claimed lien. Three theories are advanced to evade those defenses.

It is claimed and the court found that at all times the defendant Douglas Badger managed and controlled the interest of his wife, Florence Badger, in the real property the subject of plaintiff's claimed lien. There is evidence to support this finding and defendants do not directly question it. It does not necessarily follow, however, as claimed by plaintiff and as found by the trial court, that the invoice mailed to the

husband, the prelien notice mailed to the husband, the claim of lien against the husband, or the action filed against the husband, gave notice to either the husband or the wife that the plaintiff was claiming a lien against any interest which the wife might have in the property. Nor does it follow as found by the court in the absence of any other evidence, that at all times prior to the ultimate acceptance of a copy of the first amended complaint on behalf of Florence Badger, defendant Douglas Badger and his attorney were acting on behalf of Douglas Badger and as agent of his wife. As a matter of fact, until such time as Mrs. Badger was named in the proceedings, there was no occasion for anyone to act on her behalf with respect to the claim asserted by plaintiff, and there is no evidence to show that anyone did.

A

The plaintiff claimed and the court found that plaintiff had named Florence Badger as a party defendant in the original complaint under the fictitious name of "Doe One." It is contended that having been so named, the statute of limitations cannot be asserted with respect to the claim against her as she is named in the first and second amended complaints. (See Code Civ. Proc. § 474; *Austin* v. *Massachusetts Bonding & Insurance Co.* (1961) 56 Cal.2d 596, 599-600 [15 Cal.Rptr. 817, 364 P.2d 681]; *Barnes* v. *Wilson* (1974) 40 Cal.App.3d 199, 202-205 [114 Cal.Rptr. 839]; *Breceda* v. *Gamsby* (1968) 267 Cal.App.2d 167, 170-173 [72 Cal.Rptr. 832]; *Garrett* v. *Crown Coach Corp.* (1968) 259 Cal.App.2d 647, 649-650 [66 Cal.Rptr. 590]; and *Mishalow* v. *Horwald* (1964) 231 Cal.App.2d 517, 520-524 [41 Cal.Rptr. 895].) Plaintiff's attempt to treat Florence Badger as a fictitious defendant is unavailing because examination of the original complaint reveals that no cause of action has been alleged against any fictitious defendant. Ten fictitious defendants are named in the caption and leave is sought to amend the complaint to show their true names. It is not claimed, however, that any fictitious defendant is alone or with Doug Badger an "owner or reputed owner" of the property; that any fictitious defendant contracted with plaintiff alone or with Lee Bros. Value World. In short there are no allegations which purport to show how, why or in what manner any fictitious defendant should be charged. Mrs. Badger was never in fact served or formally substituted as a fictitious defendant. (See *Union Tank etc. Co.* v. *Mammoth Oil Co.* (1933) 134 Cal.App. 229, 231-232 [25 P.2d 262].) In any event the lack of charging allegations in the original complaint renders it unavailable to rebut the running of the statutory limitation period. In *Gates* v. *Wendling Nathan Co.* (1938) 27 Cal.App.2d 307 [81

P.2d 173] the court ruled: "Assuming, without deciding, that these four respondents can be treated as having been persons originally sued herein under fictitious names, the fatal weakness in appellants' present effort to pursue them is that until after the bar of the statute of limitations had been interposed no attempt whatever was made to state a cause of action against all or any of them. We are not, of course, unmindful of the settled rule that a *bona fide* attempt to state a cause of action against a party, which fails by reason of some imperfection, may be remedied by amendment so that the amended pleading will relate back to the date of the filing of the original defective pleading and avoid the running of the statute of limitations in the *interim* [citations], but we have yet to read of a case where the running of the statute has been held to be avoided by filing a complaint wherein a defendant is designated by a fictitious name and the only allegations as to him are that the plaintiff is ignorant of the defendant's true name and, when he knows it, will amend by substituting it, and at that future time make some charge against such defendant. Yet that seems to us precisely what appellants, as to these four defendants, have attempted here. If procedure of that description can be tolerated, all statutes of limitation might as well be at once and forever repealed." (27 Cal.App.2d at p. 315.)

*Gates* has been disapproved insofar as it indicates that a minor's action for wrongful death may become barred by the running of the statute of limitations during his minority. (See *Cross* v. *Pacific Gas & Elec. Co.* (1964) 60 Cal.2d 690, 694 [36 Cal.Rptr. 321, 388 P.2d 353]; *Nolan* v. *Transocean Air Lines* (1961) 365 U.S. 293, 294-296 [5 L.Ed.2d 571, 572-573, 81 S.Ct. 555].) It has otherwise been followed. (See *Schroeter* v. *Lowers* (1968) 260 Cal.App.2d 695, 697 and 701 [67 Cal.Rptr. 270]; and *Kolodziejski* v. *Hover* (1954) 124 Cal.App.2d 731, 733-734 [269 P.2d 163].) The principle that when there are general charging allegations against a fictitious defendant, they may be liberally amended to defeat the statute of limitation should be distinguished. (See *Barnes* v. *Wilson, supra,* 40 Cal.App.3d 199, 201, fn. 1 and 202-206; and *Day* v. *Western Loan & Bldg. Co.* (1940) 42 Cal.App.2d 226, 230 and 234-235 [108 P.2d 702].) In the case establishing the liberal rule the court expressly stated, "*Where a complaint sets forth, or attempts to set forth, a cause of action against a defendant designated by fictitious name* and his true name is thereafter discovered and substituted by amendment, he is considered a party to the action from its commencement so that the statute of limitations stops running as of the date of the earlier pleading. [Citations]." (*Austin* v. *Massachusetts Bonding & Insurance Co., supra,* 56 Cal.2d at p. 599, italics added.)

## B

The plaintiff contended, and the court found, that each of the defendants was estopped from asserting any statute of limitations defense to the action. The facts asserted in support of this proposition are found in a finding that defendant (who is not stated) and defendants' attorneys did innocently lead plaintiff and plaintiff's attorneys to believe that their pleadings were in order and that defendant Doug Badger was the sole owner of the land. (See *Ginns* v. *Savage* (1964) 61 Cal.2d 520, 524-525 [39 Cal.Rptr. 377, 393 P.2d 689]; *Carruth* v. *Fritch* (1950) 36 Cal.2d 426, 432-434 [224 P.2d 702, 24 A.L.R.2d 1403]; *Holland* v. *Nelson* (1970) 5 Cal.App.3d 308, 313 [85 Cal.Rptr. 117]; *Casey* v. *Anschutz* (1967) 252 Cal.App.2d 9, 16 [60 Cal.Rptr. 105]; and *Estate of Pieper* (1964) 224 Cal.App.2d 670, 690-691 [37 Cal.Rptr. 46].) The only evidence which would support such a finding is evidence of communications between plaintiff's attorneys and the attorney for defendant Douglas Badger after the statute of limitations had run. The lien claim was filed December 18, 1967. The complaint was filed March 11, 1968, only a brief period before the 90-day limitation period expired. Any communication, including an admission by failure to deny in the original answer of the defendant Doug Badger filed May 16, 1972, could not estop the wife from asserting a right which arose over four years before. It should be further noted that at all times Mrs. Badger was a co-tenant of record; that she executed the lease, and was named in and executed the memorandum of lease which was recorded July 6, 1966; that the plaintiff referred to that memorandum of lease for a description of the property in its claim of lien recorded December 18, 1967; that plaintiff again referred to that memorandum, which reflected the true recorded ownership of the property in its complaint filed March 11, 1968; that the court found that such representations, if any, as led plaintiff to believe the husband was the sole owner of the land were innocently made; and that there was no reason for the wife to have legal representation until early in 1972 when plaintiff for the first time learned that the wife was an owner of record and took action against her. Under these circumstances the assertion of estoppel against the wife is entirely without foundation.

## C

The court further found that at all times it was the intention of the defendants that their interest in the property be their community property, and that the property described in plaintiff's claim of lien was their community property. On the basis of these findings it is asserted

that it was unnecessary to make Mrs. Badger a party to the action, and she would be bound by the judgment against her husband as manager of the community property. (See *Yearout* v. *American Pipe & Steel Corp.* (1946) 74 Cal.App.2d 139, 143-144 [168 P.2d 174].) In the cited case it was established that the property was community property, and that it stood in the sole name of the husband, although he was characterized as "a married man." It was under those circumstances that the court held the wife "was not a necessary party to the action to foreclose the material-man's lien on the community property as she was represented there by her husband. Therefore the judgment foreclosing the lien was binding on her and neither she nor her husband can successfully maintain this action." (74 Cal.App.2d at p. 144.) (See also *Wolff* v. *Hoaglund* (1970) 11 Cal.App.3d 227, 230-232 [89 Cal.Rptr. 778].) Here the situation is similar to that in *Frank Pisano & Associates* v. *Taggart* (1972) 29 Cal.App.3d 1 [105 Cal.Rptr. 414], where we upheld a judgment denying foreclosure of a mechanic's lien. There we said, "Plaintiffs rely on the case of *Yearout* v. *American Pipe & Steel Corp.,* 74 Cal.App.2d 139 . . . . In *Yearout* it was held that the wife was not an indispensible party to an action to foreclose a mechanic's lien upon community property held in the name of the husband. (At p. 144.) The instant case is distinguishable. First, in the present case the property was held in the names of both spouses. Secondly, there is no indication that the Hyman property was community property. In view of plaintiffs' failure to either allege or enter proof as to the latter consideration, we decline to extend the reasoning of *Yearout* to the instant case." (29 Cal.App.3d at p. 23.)

In this case there was no evidence as to the source of the funds which were used to acquire the property. Plaintiff concedes that it is basic law that when a husband and wife take title to property in joint tenancy that they take separate and equal interests. (Civ. Code, § 5110; *Siberell* v. *Siberell* (1932) 214 Cal. 767, 773 [7 P.2d 1003], and *Nevins* v. *Nevins* (1954) 129 Cal.App.2d 150, 154 [276 P.2d 655].) It relies on the principle that the character of property may be changed from separate to community by the agreement and mutual intent of the spouses, which may be evidenced by their conduct in relation to the property. (See *Title Insurance etc. Co.* v. *Ingersoll* (1908) 153 Cal. 1, 5 [94 P. 94]; *Estate of Kruse* (1970) 7 Cal.App.3d 471, 477 [86 Cal.Rptr. 491]; *Steele* v. *Steele* (1955) 132 Cal.App.2d 301, 302-303 [282 P.2d 171]; and Cal. Family Lawyer (Cont. Ed. Bar 1962) § 4.13-4.15, pp. 106-109.) " 'A determination by a trial court that the presumption has been rebutted is conclusive on a reviewing court unless it is manifestly without support in the

evidence.' " (*Steele* v. *Steele, supra*, 132 Cal.App.2d 301, 303. See also *Nevins* v. *Nevins, supra*, 129 Cal.App.2d 150, 154.)

The only evidence to support the court's finding is that which supports the finding, reading: "At all times, defendant, Doug Badger, managed and controlled *the interest of his wife*, Florence Badger, in the real property described in plaintiff's claim of lien, *on her behalf.*" (Finding No. 28 (italics added).) As pointed out by plaintiff, the husband was the head of the family (Civ. Code, former § 5101, repealed Stats. 1973, ch. 987, § 2, p. 1898, operative Jan. 1, 1975), property may be held by the couple as joint tenants, tenants in common or as community property (§ 5104), and the respective interests of the husband and wife in community property were formerly under the management and control of the husband. (*Id.,* former § 5105; revised Stats. 1973, ch. 987, § 4, p. 1898, operative Jan. 1, 1975.) It is a non sequitur to then conclude that all property managed by the husband is therefore community property. We have been furnished with no authority for the proposition that the wife solely by entrusting, or acquiescing in, the management of her separate property by her husband, thereby converts it to community property. In *Title Insurance etc. Co.* v. *Ingersoll, supra,* the court observed, "It may be conceded that the mere acquirement of the possession of a wife's separate property by the husband, and his subsequent management and control of the same, all with her consent, do not show any intent on the part of the wife to make a gift of the property to the husband, or to change its *status* from separate to community property. The presumption in such a case appears to be that the property continues to be the separate property of the wife, and that the husband takes it in trust for his wife." (153 Cal. at p. 5.) The court's finding that the property was community property is not sustained by the record, and the action filed against the husband could in no way serve to bind the wife's separate interest in the property as a joint tenant of record. (See *Estate of Kruse, supra,* 7 Cal.App.3d 471, 477-478.)

The court also found that the husband was the reputed owner of the property described in the recorded memorandum of lease. It is obvious that this finding contains an inherent contradiction, because reference to the memorandum would disclose that the wife was one of the two named lessors. It may be that the finding can find some support in the testimony of the plaintiff's president who testified that at the time he commenced his work on the supermarket it was a matter of general knowledge that Doug Badger and Redwood Electric were the reputed owners of the land on which the market was being constructed, and that he personally did

not know of anyone else who had ownership in the land. On the basis of this finding plaintiff claims it was unnecessary to serve the defendant wife with any preliminary notice of lien pursuant to the terms of former sections 1193 and 1190.1 of the Code of Civil Procedure (now Civ. Code, §§ 3114 and 3097). (See *M. Arthur Gensler, Jr., & Associates, Inc.* v. *Larry Barrett, Inc., supra,* 7 Cal.3d 695, 706-707; *Santa Cruz Rock Pavement Co.* v. *Lyons* (1901) 133 Cal. 114, 118-119 [65 P. 329]; *Corbett* v. *Chambers* (1895) 109 Cal. 178, 180-185 [41 P. 873]; and 32 Cal.Jur.2d, Mechanics' Liens, § 79, pp. 693-695.) It is immaterial whether plaintiff should be excused for its failure to check the owners of record in connection with giving his preliminary notice of lien, or in recording his notice of lien. His failure to do so within the time in which an action could be brought to enforce a mechanic's lien was fatal.

The judgment is reversed and the case is remanded to the trial court with instructions to revise its findings of facts and conclusions of law in accordance with the views set forth above and enter judgment for defendants accordingly.