[No. E045940. Fourth Dist., Div. Two. Feb. 23, 2010.]

FORSGREN ASSOCIATES, INC., Plaintiff and Appellant, v.
PACIFIC GOLF COMMUNITY DEVELOPMENT LLC et al., Defendants
and Appellants;
COLONIAL TRUST COMPANY et al., Defendants and Respondents.

138

COUNSEL

Baute & Tidus, David Crochetiere and Robert M. Gilchrest for Defendants and Appellants.

Holland & Hart, David W. Zimmerman and Bryan K. Benard for Plaintiff and Appellant.

No appearance for Defendants and Respondents.

OPINION

GAUT, J.—Plaintiff and appellant Forsgren Associates, Inc. (Forsgren), the general contractor for construction of a public golf course and flood channel, brought this breach of contract and foreclosure action against Pacific Golf Community Development LLC (Pacific), the developer, and against property owners, Wilshire Road LLC (Wilshire), Makasa LLC (Makasa), and Desert Tortoise Public Financing Authority (Desert Tortoise). The trial court entered judgment in favor of Forsgren. It was undisputed Pacific breached the construction contract by failing to pay Forsgren in full for the construction work. The parties stipulated that Pacific owed Forsgren $1,592,638 under the construction contract. The trial court further found that Forsgren's mechanic's lien and a subcontractor's lien, assigned to Forsgren (collectively referred to as Forsgren's mechanic's lien), attached to the golf course property owned by Desert Tortoise and adjacent property owned by Wilshire and Makasa.

Wilshire and Makasa contend on appeal that the trial court erred in entering judgment authorizing foreclosure of Forsgren's mechanic's lien against their adjacent property. Wilshire and Makasa argue their adjacent land was not required for the convenient use and occupation of the golf course and was unauthorized. In addition Wilshire and Makasa argue that the mechanic's lien did not attach to their adjacent property because Wilshire and Makasa transferred the golf course property to Desert Tortoise before attachment of the lien.

Makasa and Wilshire further argue the trial court erred in awarding prejudgment and postjudgment interest. Pacific asserts the trial court erred in awarding Forsgren attorney's fees under Civil Code section 1717.[1]

Forsgren filed a cross-appeal asserting that the trial court erred in awarding prejudgment interest at the statutory rate, rather than at the interest rate specified in the construction contract.

---

[1] Unless otherwise noted, all statutory references are to the Civil Code.

We conclude Forsgren's mechanic's lien did not attach to the entirety of Makasa and Wilshire's property adjacent to the golf course property because not all of the adjacent property was required for the convenient use and occupation of the golf course. The evidence established that the lien attached only to a limited portion of the adjacent property, such as the area where a tee box was located outside the golf course property, and the portion of the property where Forsgren and its subcontractors installed irrigation, provided landscaping, and performed grading and leveling in connection with removal of topsoil transported to the golf course.

Because the trial court's judgment, authorizing foreclosure as to the entirety of Makasa and Wilshire's property, is overbroad, we reverse the judgment. We further conclude the trial court erred in awarding pre- and postjudgment interest on the foreclosure claim. Forsgren's cross-appeal is thus moot. Pacific's contention regarding attorney's fees is also moot because Forsgren never filed a motion requesting attorney's fees.

### 1. Facts and Procedural Background

In the 1980's, Manoucher Sarbaz, acting through various entities, purchased numerous parcels of land, which were combined into one large piece of vacant agricultural land, totaling 1,375 acres. This undeveloped property is located in the Lucerne Valley. Sarbaz purchased the parcels by forming partnerships with family members. These partnerships merged into limited liability companies formed by Sarbaz, known as Lucerne Valley LLC (Lucerne), Club View LLC (Club View), Wilshire Road LLC (Wilshire), and Makasa LLC (Makasa). Sarbaz was a managing member of Wilshire, Makasa, and Club View.

Sarbaz purchased the land with the intent of developing a master-planned residential community called Rancho Lucerne. Sarbaz envisioned that his development project would include 4,257 single-family homes, a 27-hole public golf course, and commercial property.

In 1995, Sarbaz and his sister, Mina Sarbaz, formed Pacific, a limited liability company, which acted as the developer for the Rancho Lucerne project. In addition, Pacific represented the landowners in connection with the development, including purchases, sales and pledges of land, receipt of funds and payment of debts. Sarbaz was manager of Pacific and Pacific's sole employee. He acted as the developer of the entire Rancho Lucerne project. Pacific had no assets and no operating history.

In 1997, the San Bernardino Planning Commission approved a master tentative tract map and a final development plan for the project. The public improvements for the project were to be financed under the Marks-Roos

Local Bond Pooling Act of 1985 (Gov. Code, § 6584 et seq.). The act enabled local government entities collectively to issue tax-exempt municipal debt as a joint powers authority (JPA) to finance the project, including the public golf course. Desert Tortoise was one of the JPA public entities that issued securities for Rancho Lucerne public improvements.

The bonds were to be payable from the anticipated revenue from the golf course and from "Project Impact Reimbursement Fees." These fees are fees the developer pledged to pay from the proceeds of lot sales and were secured by liens the developer and property owners agreed to impose on lots pledged as security property for each of the bond issuances. The project's public golf course was included in the development to attract buyers of the residential lots, raise the market value of the project, and assist the developer in retiring the outstanding debt.

According to the preliminary official statement for funding the bonds issued for financing the Rancho Lucerne development project, phase one of the project covered approximately 489 acres and was planned to include 15 holes of the public golf course located on 155 acres (including approximately five acres for the planned clubhouse), a 30-acre commercial parcel, and 1,248 single-family lots located on approximately 304 acres within the project. The 304 acres include approximately 26 acres for parks, 39 acres for roads, and 239 acres for residential lots divided into 14 development areas. Five additional holes of the public golf course, located on approximately 34 acres of property outside of but adjacent to the phase one property, were to be built at the same time. The golf course property consisted of approximately 185 acres, plus additional acreage for construction of the clubhouse.

The preliminary official statement further stated that the project was being developed by Pacific and the 489 acres, comprising phase one of the project, were owned by Wilshire. Makasa, "an affiliate" of Pacific, owned an additional 34 acres also being developed as part of the golf course. The bonds were to be used by Desert Tortoise and Legends Golf Club Community Association (Legends) to purchase the golf course property and pay for construction of the golf course by Forsgren. Pacific was to become the manager and operator of the golf course upon its completion.

Legends was a California nonprofit corporation organized in April 2000 to facilitate the acquisition and construction of the public facilities associated with the public golf course and the project, in cooperation with Desert Tortoise. Legends had no independent staff and was dependent upon Pacific and Desert Tortoise to assist with its bond-related responsibilities.

Raymond Johnson, who was the golf course designer, coordinator, and project manager for Pacific, testified that the county was required to design a flood channel for the entire Lucerne Valley. In 1996 and 1997, before the golf course was designed, the county designed a master flood channel, which was located in the vicinity of the golf course project. Johnson and the golf course architect, David Etsel, began designing the golf course in early 1997, incorporating the county's flood channel plans. Johnson completed the tentative tract map in 1997. A revised version was approved in March 1998.

In April 1998, Forsgren submitted a proposal to Pacific for the construction of the 20-hole public golf course. On December 16, 1998, Forsgren and Pacific entered into a written contract (construction contract) for the construction of the golf course, which included a driving range, practice facility, earthwork, an irrigation system, cart path, drainage, and seeding. Earl Kemp, president of Forsgren, and Sarbaz, on behalf of Pacific, signed the contract.

The construction contract provided that Pacific would pay Forsgren $2 million to construct a 20-hole golf course. Forsgren was to furnish work and material in accordance with the golf course plans. Forsgren was also responsible for designing and building an irrigation system for the course. All developer decisions were to be made by Sarbaz.

When Forsgren began construction of the golf course in early March 1999, Wilshire and Makasa owned the golf course property and adjacent property.

On June 30, 1999, Forsgren signed four change orders, resulting in an increase in the contract price from $2 million to $4,374,097. The changes were due in part to modifying the plans so that the golf course property would serve as a flood channel. The stated purpose of change order No. 1 was: "Change Bunker Construction & Cart Path Line items from original bid quantities to actual plan quantities." Change order No. 3 added irrigation and seeding, and increased "pump station & wetwell to accommodate area outside of golf course (flood control areas)." The change order also added lake circulation pumps and piping, and golf course sodding. The stated purpose of the change order was: "Increase of scope of work to accommodate extra areas not included in original contract."

During the trial, Kemp testified that what generated these changes in the project "was a county requirement that all areas that were disturbed by mass grading had to be revegetated. When we were putting in irrigation for the golf course, we expanded irrigation on the golf course to cover the areas that were disturbed in the flood control channel, on the top of the channel, and the top of the dike. We increased the pump capacity stations for the seven holes."

Kemp further explained that "The flood control channel was a channel that was required, I believe, by the county. It wasn't designed by us, but it

handled large storm water conveyance across the project. And it's not unusual for golf courses to actually be built in those type [*sic*] of conveyance channels." Kemp noted that the dikes created the channel. The change orders increased the irrigation to include watering of the entire flood control channel and all of the disturbed areas, in addition to the area where the golf course was originally set. This was done "to vegetate" the entire flood control channel for erosion control and protection.

At the end of August 1999, Forsgren and its subcontractors suspended construction due to Pacific's failure to pay their outstanding invoices.

In order to secure additional bond financing, Wilshire and Makasa transferred title to the golf course property to Desert Tortoise. In turn, on May 17, 2000, Desert Tortoise, as trustor, executed a deed of trust and assignment of rents, transferring to Legends title to the golf course property for the purpose of securing payment of the bonds. Once the bonds were paid, the property was to be transferred back to Desert Tortoise. The grant deeds were executed on April 27 and June 20, 2000, and recorded on July 13, 2000.

Pacific paid Forsgren and its subcontractors' outstanding balances with the bond funds. Thereafter, at Sarbaz's request and upon notifying Forsgren that there was additional funding available to complete the golf course project, Forsgren and its subcontractors resumed work in June 2000, with delivery of construction materials beginning on June 19, 2000.

Kemp explained at trial that originally Pacific contracted Forsgren to work solely on construction of the public golf course, which was the first phase of the Rancho Lucerne development project.[2] The second phase was going to be the development of the surrounding residential and commercial property. Forsgren entered into the construction contract with the understanding it was only hired to work on the golf course and not the residential or commercial construction. During construction of the golf course, the construction contract was expanded by change orders requiring construction related to creating a flood control channel running through the golf course.

Killebrew, who had worked on building golf courses with Forsgren for 22 years, oversaw the design and production of the Rancho Lucerne golf course. When shown a map of the golf course, Killebrew testified that the map showed features of the golf course that were to be built outside the golf course boundary lines. For instance, the "back tee" of one of the holes was outside the property line.

---

[2] There were also two phases of the golf course project, consisting of the first 20 holes and then the remaining seven holes.

John Simmons, who worked for Forsgren as a project manager, testified that Forsgren moved topsoil from the adjacent property to the golf course property to enhance the golf course topography.

Pacific failed to timely meet all of its payment obligations under the construction contract. Forsgren and its subcontractors continued working on the project until the end of January or beginning of February 2001, when work on the golf course was once again suspended. At that point, substantial portions of the golf course had been completed. As of March 2001, Pacific owed Forsgren $1,592,638.38.[3]

In March 2001, Forsgren's largest subcontractor, Ranger Construction Industries, Inc. (Ranger), recorded a mechanic's lien against the golf course property, owned by Desert Tortoise, and adjacent property, owned by Wilshire and Makasa, for nonpayment of money owed, amounting to $978,724, beginning in August 2000. In March, Ranger also filed a lawsuit for foreclosure of its lien against Forsgren, Pacific, Desert Tortoise, Wilshire, Makasa, and Legends.

Ranger filed a notice of correction of the legal description contained in its lis pendens. Ranger stated that the original lis pendens notice inadvertently included, not only the property subject to Ranger's lien, but also surrounding property, which should be released from Ranger's lis pendens.

Forsgren was unable to pay Ranger because Pacific had failed to pay Forsgren. Forsgren filed a cross-complaint against Pacific, Desert Tortoise, Wilshire, Makasa, Legends, Sarbaz, and other entities. Forsgren settled with Ranger. In return, Ranger assigned its mechanic's lien rights to Forsgren.

On May 25, 2001, Forsgren recorded a mechanic's lien against the golf course property, owned by Desert Tortoise, and adjacent property, owned by Wilshire and Makasa. Forsgren stated in its mechanic's lien that it was owed $1,594,993.95, arising from providing labor, services and materials in connection with the construction of the golf course. Forsgren also filed a lawsuit

---

[3] In a separate federal action filed by the United States Securities and Exchange Commission (SEC) against Sarbaz and Pacific, the federal district court in September 2004, found that "Unfortunately, Rancho Lucerne was not a successful development. As of this date, not a single lot has been sold, nor has the golf course been planted or opened for play. As a result of the bond offerings, Rancho Lucerne has incurred approximately $70.8 million in debt, of which $53.7 million is outstanding. [Fn. omitted.] The debt that has been retired, approximately $17.1 million, was paid from subsequent bond offerings, not from project revenues. Pacific Golf is currently in default on the bonds, and the land that was pledged as security is woefully inadequate as a source of repayment. [Fn. omitted.] Needless to say, investors have lost millions of dollars." Apparently, as a consequence, Forsgren's only recourse was to foreclose on the golf course property and adjacent land owned by Wilshire and Makasa.

and amended complaint for breach of contract against Pacific and for foreclosure of its liens (including Ranger's lien assigned to Forsgren) against Pacific, Wilshire, Makasa, and Legends. Forsgren recorded a lis pendens against the golf course property, owned by Desert Tortoise, and adjacent property, owned by Wilshire and Makasa.

In June and July 2001, default was entered against Desert Tortoise and Legends on Ranger's foreclosure lawsuit. In October 2002, default was entered against Desert Tortoise, Sarbaz, and Legends on Forsgren's foreclosure lawsuit.

During a bench trial on Forsgren's action, the parties stipulated to a statement of facts, which included most of the facts summarized above. At trial, the parties contested whether Forsgren's liens applied only to the golf course property, which Makasa and Wilshire transferred to Desert Tortoise midway through the golf course construction or whether the liens also attached to the rest of Makasa and Wilshire's property, adjacent to the golf course property, which was part of the Rancho Lucerne development.

Forsgren argued at trial and in a posttrial brief, that its mechanic's liens attached to Wilshire and Makasa's adjacent property because the golf course construction, including the flood channel work, benefited their property. Forsgren also argued the mechanic's liens attached to the entire property, including the golf course property and adjacent property, because the liens attached before the golf course property was severed from Wilshire and Makasa's adjacent property.

Wilshire, Makasa, and Pacific argued that the mechanic's liens did not attach to any property, other than the golf course property, because the use and operation of the golf course did not require construction of the surrounding residential and commercial property. Also, any construction work on the adjacent property was not authorized and therefore could not constitute a basis for the lien claims. In addition, Wilshire, Makasa, and Pacific argued that interest and attorney's fees were not recoverable through the mechanic's lien.

In August 2007, the trial court issued a detailed written statement of decision ruling in favor of Forsgren. The court found, as stipulated by the parties, that Pacific owed Forsgren $1,592,638. The court further found Pacific liable to Forsgren for breach of contract and awarded Forsgren damages in the amount of $1,592,638, plus prejudgment interest at the rate specified in the construction contract, and postjudgment interest at the statutory rate. The court also found Forsgren was entitled to attorney's fees and costs, contingent upon Forsgren filing a memorandum of costs and motion for attorney's fees.

The trial court also held that Forsgren was entitled to foreclose on Forsgren's mechanic's liens, including the Ranger lien assigned to Forsgren, and that the liens attached to the entirety of Makasa and Wilshire's property surrounding Desert Tortoise's golf course property. Forsgren thus was permitted to foreclose on all of the real property interests of Makasa, Wilshire, Desert Tortoise, Legends, and Pacific.

In reaching its decision, the trial court reasoned that Wilshire and Makasa's transfer of its golf course property to Desert Tortoise in 2000 did not extinguish Forsgren's liens against Wilshire and Makasa's adjacent property. The court also held that the liens attached to the adjacent property because the adjacent property was "benefited by, and necessary to the convenient use of the construction of the golf course."

The court explained: "The golf course in the flood channel mandated for the development of all of the defendants' property, was constructed solely to facilitate and enhance the profitable development of defendants' land holdings as residential lots on a golf-centered community."

Judgment was entered in favor of Forsgren and against Pacific, Wilshire, Makasa, Desert Tortoise, and Legends, and foreclosure on Forsgren's liens was ordered against the property interests of Wilshire, Makasa, Desert Tortoise, and Legends.

## 2. Mechanic's Liens

Wilshire and Makasa contend the trial court erred in finding that Forsgren's mechanic's liens, including Ranger's lien assigned to Forsgren, extended to Wilshire and Makasa's property adjacent to Desert Tortoise's golf course property. The property description in Forsgren and Ranger's mechanic's liens included the golf course property transferred to Desert Tortoise (golf course property) and Wilshire and Makasa's adjacent property (adjacent property).

The purpose of a mechanic's lien is to secure payment to a person who benefits another's property, by giving the person a lien on the real property that has increased in value from the improvement. (§§ 3110, 3112.) Under California's mechanic's lien law, a mechanic's lien attaches to any interest in a work of improvement and the real property on which it is situated. (§ 3128.) The lien is a direct lien, similar to a mortgage, and is imposed as security for payment of sums due the mechanic. (§ 3123; *Laubisch v. Roberdo* (1954) 43 Cal.2d 702, 709 [277 P.2d 9]; 10 Miller & Starr, Cal. Real Estate (3d ed. 2009) § 28:4, p. 18.) To preserve a mechanic's lien, the lien claimant must record a claim of lien within certain time periods

146

following the completion or cessation of work. (§§ 3115–3116.) The recordation of the claim of lien provides constructive notice of the lien to subsequent purchasers and encumbrancers. (10 Miller & Starr, *supra*, § 28:48, pp. 159–160.)

Although the claim of lien may be recorded after the work is completed, the lien relates back to the date the first labor or material was furnished for the work of improvement, and transferees who take an interest in the property after work has begun, and before the claim of lien is recorded, take subject to the lien. (*Schrader Iron Works, Inc. v. Lee* (1972) 26 Cal.App.3d 621, 631–632 [103 Cal.Rptr. 106]; *Simons Brick Co. v. Hetzel* (1925) 72 Cal.App. 1, 5 [236 P. 357]; *Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1247 [8 Cal.Rptr.2d 298]; see Cal. Mechanics' Liens and Related Construction Remedies (Cont.Ed.Bar 3d ed. 2009) § 2.64, pp. 78–79 (11/07 supp.).)

In the instant case, on April 27, 2000, Wilshire executed two grant deeds transferring its title to portions of the golf course property to Desert Tortoise. On June 20, 2000, Wilshire and Makasa executed two additional grant deeds transferring title to the remaining portions of the golf course property to Desert Tortoise. Three of the grant deeds were signed by Sarbaz and one grant deed was executed by a relative of Sarbaz. On July 13, 2000, all four grant deeds transferring Makasa and Wilshire's title to the golf course property to Desert Tortoise were recorded. Wilshire and Makasa retained ownership of all of their property adjacent to the golf course, which was intended for residential and commercial development as part of the Rancho Lucerne development.

The trial court found that on June 19, 2000, Forsgren's mechanic's lien attached to both the golf course property and Wilshire and Makasa's adjacent property because the lien attached before Wilshire and Makasa transferred the golf course property to Desert Tortoise. The trial court stated in its decision that any unrecorded transfers of Wilshire and Makasa's property after June 19, 2000, were void against Forsgren's interests in such properties. The four grant deeds transferring title to the golf course property from Wilshire and Makasa to Desert Tortoise were not recorded until July 13, 2000, after Forsgren's mechanic's lien attached.

The evidence, however, establishes that title to part, if not all, of the golf course property was conveyed to Desert Tortoise before the lien attached on June 19, 2000.

■ It is undisputed Forsgren's mechanic's lien attached on June 19, 2000. This is because a mechanic's lien attaches to the improved property when the

first labor or construction material is furnished for the construction work. (*Parsons Brinckerhoff Quade & Douglas, Inc. v. Kern County Employees Retirement Assn.* (1992) 5 Cal.App.4th 1264, 1266 [7 Cal.Rptr.2d 456].) A mechanic's lien cannot be defeated or otherwise affected by the conveyance of the property after the lien attaches. (*Ibid.*) In *Schrader Iron Works, Inc. v. Lee, supra*, 26 Cal.App.3d 621, the court held that the plaintiff, a supplier and installer of structural steel, could foreclose on its mechanic's lien against the present owners of the property, even though the current owners purchased the property after attachment of the lien. (*Id.* at pp. 632, 634.) In discussing application of mechanics' liens generally the court stated: " 'The lien of a mechanic or materialman is a constitutional right and attaches to the structure as the material is furnished or labor performed. . . . It exists with all of its force at all times between the furnishing of the material or the performing of the labor, and the expiration of the time within which such notices of lien may be filed.' [Citations.] Moreover, a lien continues through the period of enforcement. [Citation.]" (*Id.* at pp. 631–632; see also *Lambert v. Superior Court* (1991) 228 Cal.App.3d 383, 385–386 [279 Cal.Rptr. 32] (*Lambert*).)

The *Schrader* court further noted that "It has long been the law in this state, and the general rule uniformly recognized, that a mechanic's lien has priority if it attaches to the property before the conveyance is made and that the conveyance does not affect liens which have already accrued on the premises." (*Schrader Iron Works, Inc. v. Lee, supra*, 26 Cal.App.3d at p. 632.)

Under section 1091, "An estate in real property . . . can be transferred only by operation of law, or by an instrument in writing, subscribed by the party disposing of the same, or by his agent thereunto authorized by writing." Code of Civil Procedure section 1971 further provides: "No estate or interest in real property . . . nor any power over or concerning it, or in any manner relating thereto, can be created, granted, assigned, surrendered, or declared, otherwise than by operation of law, or a conveyance or other instrument in writing, subscribed by the party creating, granting, assigning, surrendering, or declaring the same, or by the party's lawful agent thereunto authorized by writing."

As explained in section 1053, "A transfer in writing is called a grant, or conveyance, or bill of sale. The term 'grant,' in this and the next two Articles, includes all these instruments, unless it is specially applied to real property." Here, title to the golf course property was transferred by grant deed. There is also evidence that Desert Tortoise, Makasa, and Wilshire agreed in writing to the conveyance to Desert Tortoise of the golf course property around April or May 2000, in connection with Desert Tortoise providing bond financing before Forsgren would resume construction of the golf course. The bond financing was conditional upon Wilshire and Makasa transferring title to the golf course to Desert Tortoise.

Although the four grant deeds transferring Wilshire and Makasa's title to the golf course property to Desert Tortoise were recorded on July 13, 2000, the date of recording was not the date of transfer of title to the property. Under section 1217, "[a]n unrecorded instrument is valid as between the parties thereto and those who have notice thereof."

Here, the evidence established that the golf course property or a portion of it was transferred to Desert Tortoise the day before the bond closing in April 2000, and Forsgren was aware of this when it resumed work on the golf course in June 2000. Evidence of this included the two grant deeds signed on behalf of Wilshire on April 27, 2000, transferring a portion of the golf course property to Desert Tortoise. As to the Makasa golf course property (34 acres) and the remaining portion of Wilshire's golf course property, transfer of title occurred, at the latest, within a day after delivery began of golf course construction materials.

Even though two of the grant deeds were executed the day after the delivery of construction materials began, there is evidence indicating that Desert Tortoise, Makasa, and Wilshire transferred title to the golf course property to Desert Tortoise when Desert Tortoise provided bond funding to Pacific, which was conditional upon transfer of title to the golf course property to Desert Tortoise. Also, one of the conditions of Forsgren and its subcontractors resuming work on the golf course was that they be paid all amounts due and owing for previous work performed. This condition could not be met until Pacific obtained bond financing from Desert Tortoise, which, in turn, was conditional upon transfer of title to the golf course property to Desert Tortoise.

The golf course property was used as security for the bond offering. The underwriting of the bond offering was completed on April 28, 2000. On May 31, 2000, Forsgren received documentation, including the preliminary official statement for the bond offering, informing it that bond funding was available to complete the golf course. Before Forsgren resumed work, it was paid for all amounts past due from the bond offering funds underwritten in April.

Not only do these circumstances establish that ownership of the golf course property transferred at the close of the underwriting of the bond offering on April 28, 2000, before Forsgren resumed work on the golf course in June 2000, but in addition, on May 17, 2000, Desert Tortoise transferred to Legends by deed of trust and assignment of rents, Desert Tortoise's interest in the golf course property. The deed of trust states the conveyance served the purpose of securing payment of $14 million in bonds.

Based on these circumstances established by the evidence in the record, we conclude the golf course property transferred in whole or in part before

Forsgren resumed work on the golf course. The intent of Makasa, Wilshire, and Pacific was clearly to transfer to Desert Tortoise a portion, if not all, of the golf course property before Forsgren resumed construction on the golf course in June.

Forsgren argues it had no notice until August 2000 that ownership of the golf course property had transferred to Desert Tortoise, after the transfer was recorded. But Forsgren knew that in order for Pacific to meet Forsgren's conditions for resuming construction, which included payment of all money owed to Forsgren and its subcontractors for previous work and materials, Pacific had to obtain additional bond financing, which required transfer of the golf course property to Desert Tortoise. Forsgren refused to resume construction until it was paid in full for previous work and there was funding available for completion of the project.

Kemp, Forsgren's president, testified that he was informed on April 28, 2000, that there had been successful underwriting of the bond funding for the construction. This indicated title to the golf course property had been conveyed to Desert Tortoise. Kemp also testified that he requested to see the bond offering to verify that there was money available for the construction and stated that he would have looked at the bond offering before he would have signed the change order to do more construction work. A reasonable inference thus can be made that Forsgren was aware that ownership of the golf course property had been conveyed to Desert Tortoise when Forsgren resumed work on the golf course in June 2000.

Regardless of whether the mechanic's lien attached before or after title to the golf course property transferred to Desert Tortoise, the mechanic's lien attached to the Wilshire and Makasa's adjacent property under the convenient use doctrine. The convenient use doctrine is based on section 3128, which defines the scope of the real property to which a mechanic's lien attaches.

Section 3128 states: "The liens provided for in this chapter shall attach to the work of improvement and the land *on which it is situated together with a convenient space about the same or so much as may be required for the convenient use and occupation thereof*, if at the commencement of the work or of the furnishing of the materials for the same, the land belonged to the person who caused such work of improvement to be constructed, but if such person owned less than a fee simple estate in such land then only his interest therein is subject to such lien, except as provided in Section 3129." (Italics added.)

The person who caused the golf course construction work was Sarbaz, acting on behalf of Pacific, the developer. Pacific, in turn, was acting on

behalf of the property owners, which included Makasa, Wilshire, and Desert Tortoise. Sarbaz not only managed Pacific but also was a managing member of Makasa and Wilshire. The property identified in Forsgren's mechanic's liens included not only the golf course property, but also the adjacent property owned by Makasa and Wilshire.

Under such circumstances, in which Sarbaz operated, managed, and had an interest in Pacific, Makasa, and Wilshire, it can be reasonably inferred that he was well aware of the construction services provided by Forsgren and the nature and location of Forsgren's construction work performed on the Makasa, Wilshire, and Desert Tortoise properties. (*Scott, Blake & Wynne v. Summit Ridge Estates, Inc.* (1967) 251 Cal.App.2d 347, 354–355 [59 Cal.Rptr. 587].) Forsgren's mechanic's liens thus attached to all such property on which the golf course construction was *"situated together with a convenient space about the same or so much as may be required for the convenient use and occupation thereof."* (§ 3128, italics added.)

Section 3129, which provides an exception to attachment of a lien under section 3128, states: "Every work of improvement constructed upon any land and all work or labor performed or materials furnished in connection therewith with the knowledge of the owner or of any person having or claiming any estate therein shall be held to have been constructed, performed, or furnished at the instance of such owner or person having or claiming any estate therein and such interest shall be subject to any lien recorded under this chapter unless such owner or person having or claiming any estate therein shall give a notice of nonresponsibility pursuant to Section 3094."

Section 3094 states: " 'Notice of nonresponsibility' means a written notice, signed and verified by a person owning or claiming an interest in the site who has not caused the work of improvement to be performed, or his agent . . . ." "However, an owner who has authorized construction, either by himself or through an agent cannot escape liability despite the filing of a notice of nonresponsibility." (*Los Banos Gravel Co. v. Freeman* (1976) 58 Cal.App.3d 785, 793 [130 Cal.Rptr. 180].)

Here, neither Wilshire nor Makasa provided a notice of nonresponsibility pursuant to section 3094 and a reasonable inference can be made that Wilshire and Makasa, through Sarbaz, the developer and managing member of Wilshire and Makasa, had knowledge of the construction work done on Wilshire and Makasa's property adjacent to Desert Tortoise's golf course property. Therefore, under sections 3094 and 3129, any portion of Wilshire and Makasa's adjacent property that was required for the convenient use and occupation of the golf course was subject to Forsgren's mechanic's lien.

In determining the scope of the mechanic's lien, that is, the amount of land subject to the lien, the trial court was required to take into consideration the use and purpose for which the improvement was intended. (*Pacific Coast Refrigeration, Inc. v. Badger* (1975) 52 Cal.App.3d 233, 243 [124 Cal.Rptr. 786] (*Badger*).) The area of land subject to a lien "largely depends on the character of the improvement." (*Springer Land Association v. Ford* (1897) 168 U.S. 513, 530 [42 L.Ed. 562, 18 S.Ct. 170].) The lien laws are to be liberally applied in favor of the party who provided services and improvements to the land. (*Badger, supra,* 52 Cal.App.3d at p. 243.)

In *Western W. Wks. v. California F. Co.* (1923) 60 Cal.App. 749, 758 [214 P. 491] (*Western*), the court reversed the trial court ruling that the landowner's property was not subject to a mechanic's lien filed by the plaintiff. The trial court found that none of the property subject to the plaintiff's mechanic's lien was necessary for the convenient use and occupation of the improvements placed on the owner's property, except for a circle of ground around the spot where the plaintiff had drilled a test bore in search of water. (*Id.* at p. 752.) The trial court also found the property owner had no notice or knowledge of the work the plaintiff had performed at the request of another party, which was in possession of the property. (*Id.* at p. 755.) Therefore, the property owner was not required to give notice of nonresponsibility for the work in order to avoid responsibility under the lien. (*Id.* at pp. 752–753.)

On appeal, the *Western* court reversed, concluding the evidence established that the owner had notice and knowledge of the plaintiff's work. Therefore, under Code of Civil Procedure former section 1192 (now Civ. Code, § 3129), it was incumbent upon the owner to file a notice of nonresponsibility for the work. The *Western* court held that, because the owner had not done so, the portion of the property upon which the work was done was subject to the plaintiff's lien. (*Western, supra,* 60 Cal.App. at pp. 755–756.)

In determining the scope of the lien, the *Western* court concluded that none of the property in question was necessary for the convenient use and occupation of the improvements, other than a circle of ground where the test bore work was done, even though it was undertaken to provide water for the entire property. (*Western, supra,* 60 Cal.App. at pp. 756–757.) The *Western* court stated that Code of Civil Procedure former section 1185 (now Civ. Code, § 3128) not only allows the extent of the lien to include "the immediate land occupied by the structure itself, but also 'a convenient space about the same, or so much as may be required for the convenient use and occupation thereof.' " (*Western,* at p. 757.) The court explained, "The question is not so much as to the amount of land required for the area to be occupied by the well and its appliances, but rather as to the amount of land to be improved or benefited by the creation and use of the well. . . . 'The general theory upon

which liens to laborers, mechanics and materialmen are given is that by the labor or use of the material the property has been enhanced in value.' " (*Ibid.*)

Citing *Springer Land Association v. Ford, supra*, 168 U.S. at page 530, the court in *Western* noted, " 'The truth is that what area of land is subject to lien in a given case largely depends on the character of the improvement. The extent of ground proper and necessary to the enjoyment of the building, a wall or a fence would not be the same as that required for or pertaining to an irrigation system, but the principle of determination is the same. This ditch was to expend its waters on this tract and could not be used or operated without it. Each was dependent on the other and both were bound together in the accomplishment of a common purpose. The lien must apply to the entire tract or be confined to the right of way through which it took its course, and to narrow it down to the latter would be to disregard the very terms of the statute.' In determining the amount of land to be subjected to the lien of the plaintiff in the instant case the trial court should take into account the fact that the mechanic's lien law is to be liberally construed with a view to effecting its purpose." (*Western, supra*, 60 Cal.App. at p. 758.)

In *Badger, supra*, 52 Cal.App.3d 233, the court held that the lien of the plaintiff contractor, who furnished labor and materials in the construction of refrigeration and air-conditioning facilities for a supermarket in a proposed shopping center, did not extend to an adjacent parcel set aside for the construction of a service station. The service station site had been excepted from the property subject to the deed of trust executed to finance the shopping center. The court in *Badger* concluded the plaintiff failed to establish that the service station site was required for the convenient use and occupancy of the land on which the supermarket was situated. Therefore it was neither equitable nor required to extend the lien to the service station parcel. (*Id.* at pp. 246, 248.)

In summarizing the applicable mechanic's lien principles, the *Badger* court quoted *Anselmo v. Sebastiani* (1933) 219 Cal. 292 [26 P.2d 1], which explained: " 'The determination of this area must take into consideration the intended use for which the building is erected. If erected for the purposes of use as a separate and distinct unit, then the area of land required for its convenient use may properly be limited only to an area necessary for ingress and egress, but if its use is dependent upon, and connected with the uses made of other buildings or the uses made of other portions of the tract of land upon which it is situate, then if all of the larger tract is required for the "necessary and convenient use" of the building involved, such larger tract may properly be included in the order of sale.' " (*Id.* at pp. 297–298; see also *Badger, supra*, 52 Cal.App.3d at p. 243; *Springer Land Assn. v. Ford, supra*, 168 U.S. at p. 530.)

In order for the lien to attach to the adjacent property, the purpose for which the building or improvement in question is erected must be "so intimately and directly connected with the operations carried on in the adjacent buildings as to constitute it an essential part and parcel" of the improvement. (*Badger, supra*, 52 Cal.App.3d at p. 244.)

In concluding "the supermarket was neither dependent on nor connected with the proposed service station operation, nor would it more than incidentally benefit such an operation" (*Badger, supra*, 52 Cal.App.3d at p. 244), the *Badger* court noted: "The question properly phrased is: Does the convenient use and occupation of a supermarket, with an appropriate easement for parking, driveway, walkway and common areas, require an additional parcel of approximately 110 feet by 140 feet so that a service station can be constructed on that parcel to attract customers and provide conveniences for the customers of the supermarket? The answer is obviously, no. The lenders under the construction loan, who undoubtedly had a lot more at stake than the plaintiff contractor, apparently also concluded that the supermarket project could properly be financed without the addition of a service station site." (*Id.* at p. 245.)

Here, Desert Tortoise, the entity providing financing for the golf course project, agreed to provide bond funding for the golf course project in return for transfer of the portion of Makasa and Wilshire's land that was believed to comprise the golf course. The land was intended to be used to secure Desert Tortoise's funding of the golf course.

The court in *Badger* also pointed out that certain difficulties may arise "where, as here, the work is not undertaken all at once under one general contract. When the development is by stages, on separate plots, the granting of lien on the whole to anyone who contributes labor or material to a particular unit could result in encumbering the entire project because of the default of one tenant or concessionaire. Moreover, it could lead to serious conflicts." (*Badger, supra*, 52 Cal.App.3d at p. 245.) Such an expansive interpretation of section 3128 would potentially result in mechanic's liens, arising from construction on a limited portion of a development or phase of a multiphase project, extending to an entire, multiphase development.

As in *Badger, supra*, 52 Cal.App.3d 233, here, the golf course development was only one phase of a larger project. Extending the lien to the adjacent land which was intended to be a residential and commercial development, separately financed and developed by other entities, could lead to conflicts, as noted in *Badger*. (*Id.* at p. 245.)

The *Badger* court further reasoned that, even though the adjacent service station property might create business for the supermarket by attracting

potential customers, the service station was not necessary to the convenient use and occupation of the supermarket. (*Badger, supra,* 52 Cal.App.3d at pp. 246–247.) The court concluded "The service station's use is foreign to the supermarket use except as it might 'tend to bring custom[ers] to its doors.' " (*Id.* at p. 247.)

Although in *Badger* the dispute was between the contractor and lessee, rather than between the owner, developer, and contractor, as in the instant case, nevertheless *Badger* is instructive in illustrating that a mechanic's lien only attaches to adjacent property if the adjacent property benefits the improved property and is required or used by the improved property. Although Wilshire and Makasa's adjacent property might attract customers to the golf course, under *Badger* this is not a sufficient basis for attaching the lien to the adjacent property. Here, the golf course is a business separate and independent from the surrounding residential and commercial property. While the golf course was intended to attract commercial businesses and residents to the development, the use and operation of the public golf course is foreign to the property surrounding the golf course.

Even though the adjacent property would no doubt benefit from the construction of the public golf course, and the golf course and flood channel improvements would increase the value of the adjacent residential lots, such factors do not support extending the mechanic's liens to the adjacent property. As noted in *Badger,* " 'It is not the use to which the land was to be put that adjoins the improvement that determines the extent of the lien, but rather the use for which the improvement was constructed.' " (*Badger, supra,* 52 Cal.App.3d at p. 248, quoting *Gregg v. H. & M. Drilling Co.* (1928) 92 Cal.App. 189, 193 [267 P. 903].) In the instant case, the improvement was constructed for use as a public golf course and flood channel. Only the portion of the property that was necessary to the convenient use and occupation of the golf course and flood channel was subject to Forsgren's lien.

Contrary to the trial court's findings, we conclude Forsgren's mechanic's lien only extended to a limited portion of Wilshire and Makasa's adjacent property. Such property included a sliver of land upon which sprinklers for the golf course were installed and areas in which topsoil was removed and vegetation was planted. There was also a tee placed outside the golf course property boundary.

As summarized in Forsgren's posttrial brief, Forsgren's construction services and materials provided outside the Desert Tortoise golf course property included: "(1) irrigation components installed and designed to irrigate property outside the limits of the Golf Course, . . . (2) one green installed outside

the limits of the Golf Course, (3) cut, borrow, and leveling work on residential lots, and (4) installation of an irrigation system in the residential areas surrounding the Golf Course."

There is substantial evidence in the record establishing this. Kemp, president of Forsgren, testified that the golf course project was modified to include a flood channel running through the golf course. He explained that "[t]he flood control channel was a channel that was required, I believe, by the county. It wasn't designed by us, but it handled large storm water conveyance across the project. And it's not unusual for golf courses to actually be built in those type [*sic*] of conveyance channels."

Kemp noted that the project change orders increased the irrigation to include watering of the entire flood control channel and all of the disturbed areas, in addition to the area where the golf course was originally set. This was done to vegetate the entire flood control channel for erosion control and protection. Kemp stated that "[E]rosion control had to be done outside of the project because irrigation had to be added on the street because the top soil had to be taken off the project and put on the project from other spots . . . ." Kemp testified that, as a consequence, "we became involved extensively on the other project," referring to the development of the surrounding residential and commercial property.

In a faxed letter, dated December 3, 1999, from Killebrew of Forsgren, to Sarbaz, Forsgren requested disbursement of funds owed to Forsgren for construction services provided pursuant to change orders Nos. 2 and 3. Killebrew stated in the letter that "Each of the tasks listed below would be considered work performed for the flood control/reclamation portion of your project. . . . Along with Change Orders 2 & 3, a portion of our original contract had been adjusted to accommodate the flood control/reclamation work. Two of the line items (irrigation and drainage) were expanded to include areas outside the Golf Course that were within the flood control/reclamation areas and scope. These two costs include the purchase of materials that are presently at the project site that are exclusively for the flood control/reclamation portion of your project."

When construction resumed in June 2000, bundles of irrigation pipe and related materials were delivered to the golf course site. Workers began installing the irrigation system. Kemp testified at trial that, as a result of change order No. 3, the scope of the construction work expanded to "accommodate extra areas not included in the original contract . . . to accommodate areas . . . outside of [the] golf course . . . ."

Kemp further stated that Sarbaz asked Forsgren to hire Mark Gooch to work as the superintendent on the golf course project and to put him under

the golf course construction contract. Gooch worked on the golf course site under Forsgren for several months in October and November 2000. He inspected Forsgren's subcontractors' work on the insulation of the irrigation system, helped lay out the sprinkler heads where he wanted them placed, installed materials purchased by Sarbaz, and installed a sprinkler system for part of the residential area.

Kemp testified Forsgren filed liens on every piece of property it did work on, which not only included the golf course property owned by Desert Tortoise, but also the land on which Forsgren did additional work outside the boundary of the golf course property. Such work included "work along the flood channels, including putting heads at the top of the dike inside property owners [sic] so we could get that erosion reestablished and put native seeding back in. So I know around this peripheral boundary there was significant—we tried to keep the heads as close as possible to the property line, but there's a 70-foot strip we were trying to irrigate around the golf course boundary next to the flood channel. . . . [¶] . . . [¶] . . . [W]e also took top soil from significant—a significant amount of top soil off the golf course. We took that off of locations as we were directed because there was a need to level those areas. So we actually hauled in farther than we wanted to. We know that we put irrigation in on the frontage road down below. We know that we performed services associated with taking care of plants and those sorts of things. We know that we put a tee off this boundary. We know that—I think there were two tees that went outside the boundary to make sure that they work. So any area—if you take any of those areas, any area we worked on is where we filed the mechanics liens, period."

Killebrew testified that Gooch acted as superintendent of the golf course project and as the owner's representative and inspector. Gooch and his small crew did various kinds of work around the golf course and on the adjacent property. Killebrew also testified that a map of the golf course showed features of the golf course that were to be built outside the golf course boundary lines, such as a tee for one of the holes.

John Simmons, who worked for Forsgren as a project manager, testified that, as Pacific's superintendent and representative, Gooch performed irrigation work and was on Forsgren's payroll in the fall of 2000. Simmons further testified that Pacific knew where topsoil was being removed from the adjacent property. Forsgren was instructed to remove topsoil from the locations off the golf course property where grading would be needed for the development of the adjacent property. Otherwise, Forsgren would have taken topsoil closer to where it was needed on the golf course because it would have been easier to do so. Exhibit 168 shows the areas outside the golf course property where topsoil was removed and transported to the golf course.

Sullivan, who worked for Forsgren's subcontractor, Precision Irrigation, previously known as Tri-City Sprinklers, testified that outside the golf course property, he "stubbed off" the irrigation system so that it could later on be connected with the residential development. This was done 30 feet off the golf course turf to avoid tearing up the golf course when the water supply was connected with the residential development.

Raymond Johnson, who was designer for the project, project manager, and coordinator, retained by Pacific, testified that one of the topsoil removal areas, located outside the golf course property, was where Forsgren installed an irrigation system. The area needed irrigation because it was being used as a nursery for growing trees while the project was being developed. Johnson also noted that a road was constructed along with water lines to the road. Johnson acknowledged the golf course plans showed one of the areas where there was removal of the topsoil outside the golf course property. The irrigation was installed when Forsgren resumed work in 2000. Forsgren was going to connect the golf course irrigation system with the irrigation system outside the property. Johnson and Gooch, who was paid by Pacific and reported to Johnson, installed the irrigation system.

According to Johnson, topsoil was removed outside the golf course property and transported onto the golf course to provide a better seedbed on the golf course. Ranger ran a scraper over two areas outside the golf course property, but within the flood channel.

Wilshire and Makasa argue they did not authorize the work on Wilshire and Makasa's adjacent property. But there is strong evidence to the contrary. Sarbaz was acting on behalf of the developer, Pacific, and also had an interest in and managed Makasa and Wilshire. In addition, Gooch was retained by Forsgren, at Sarbaz's request, to act as superintendent and inspector of the golf course project, while also acting as Pacific's representative on the project during the fall of 2000. There is evidence that Wilshire and Makasa, through Sarbaz, had knowledge of and authorized the irrigation and soil removal work on Wilshire and Makasa's adjacent property. There is evidence Forsgren's work was done at Sarbaz's request or as directed by Gooch and Sarbaz, and was performed in accordance with the construction contract and change orders.

Change order No. 3 states that it provided for: "[i]ncreased Size for Off Course Watering & 27 Hole Total." Change order No. 5 provided for installation of a low-pressure irrigation system on part of the adjacent residential property. Gooch approved and directed placement of the irrigation components, including those outside the golf course property. The approved plans also show a tee box for one of the holes outside the golf course

boundary line. Sarbaz signed the construction contract and authorized the change orders. Also, Johnson of Pacific instructed Forsgren as to the locations where the topsoil was to be removed. The removal areas were selected based on where future cuts in the residential properties would be needed, rather than where removing the soil would have been closer and more convenient. Such evidence sufficiently refutes Wilshire and Makasa's contention that they were unaware of the work done on their adjacent property and that the work was unauthorized.

■  Although Forsgren's mechanic's lien did not attach to all of Wilshire and Makasa's property, we conclude a limited portion of their adjacent land was subject to Forsgren's lien based on evidence Forsgren provided on the adjacent property construction work, materials, and improvements benefiting the golf course and flood channel. The trial court judgment authorizing attachment of the mechanic's lien to the entirety of Wilshire and Makasa's adjacent property is thus reversed as overbroad.

### 3.   Prejudgment and Postjudgment Interest

Wilshire and Makasa assert the trial court erred in awarding Forsgren prejudgment interest on amounts secured by the mechanic's lien and post-judgment interest on the judgment of foreclosure. Wilshire and Makasa argue such interest is not permitted under section 3123. Because Wilshire and Makasa's challenge to the interest award likely will arise upon remand, we will address the issue in this appeal.

■  Section 3123, subdivision (a) provides in relevant part: "The liens provided for in this chapter shall be direct liens, and shall be for the reasonable value of the labor, services, equipment, or materials furnished or for the price agreed upon by the claimant and the person with whom he or she contracted, whichever is less. . . ." This language does not preclude the trial court from awarding interest on the lien award. Section 3123 only limits the amount of the lien, not pre- and postjudgment interest.

The cases relied on by Wilshire and Makasa are inapposite. For instance, in *Lambert, supra,* 228 Cal.App.3d 383, the court did not discuss pre- or postjudgment interest. In *Lambert,* our high court addressed the issue of whether the contractor's lien could include "delay/interest damages." (*Id.* at pp. 385, 388.) The construction contract included a provision which permitted delay damages to be billed as extra work. (*Id.* at p. 388.) The court in *Lambert* held that section 3123 does not allow damages based on delay, regardless of whether the construction contract describes them as extra work. (228 Cal.App.3d at p. 389.) The separate issue of whether interest is proper on a foreclosure judgment arising from a mechanic's lien was not raised or addressed in *Lambert.*

The issue was, however, addressed in *Bentz Plumbing & Heating v. Favaloro* (1982) 128 Cal.App.3d 145 [180 Cal.Rptr. 223] (*Bentz*). In *Bentz*, the court reversed the trial court's ruling denying the plaintiff prejudgment interest on his claim for payment for plumbing services provided in connection with the construction of a restaurant. The *Bentz* court held the plaintiff was entitled to prejudgment interest under section 3287, from the date identified in the plaintiff's mechanic's lien as of the date when the obligation became due. (*Bentz*, at p. 152.) The parties to the action stipulated at the commencement of trial as to the amount of work completed by the plaintiff. Because there was a liquidated contractual claim, the plaintiff was entitled to prejudgment interest on the amount owed. (*Ibid.*)

As in *Bentz, supra*, 128 Cal.App.3d 145, here, the parties stipulated at the commencement of trial as to the value of the amount of work completed by Forsgren. The parties stipulated the reasonable value of Forsgren's unpaid work as of March 25, 2001, was $1,592,638.38.

Under *Bentz, supra*, 128 Cal.App.3d at page 152, prejudgment and post-judgment interest was proper if it was based on a liquidated claim against Wilshire and Makasa. Wilshire and Makasa argue the interest award was improper as to them because they did not enter into the construction contract with Forsgren, they did not authorize any work on their adjacent property, and there was no stipulation by the parties or determination by the court as to the amount owed for the work performed on their adjacent land.

We conclude that, even assuming interest is permitted when there is a liquidated mechanic's lien claim, here, the trial court erred in ordering Wilshire and Makasa to pay interest based on the stipulated value of the entire amount owed Forsgren, when the stipulated amount was for work performed, not only on Wilshire and Makasa's land, but also primarily for the work performed on the golf course property. There was no apportionment of the interest on the mechanic's lien claim between the golf course property and Wilshire and Makasa's adjacent property. Without such apportionment, it was possible for Forsgren to recover the full interest on the mechanic's lien from both the owner of the golf course property, Desert Tortoise, and from Wilshire and Makasa, as owners of the adjacent property.

Since Wilshire and Makasa did not own the entire property subject to the mechanic's lien and thus were not responsible for payment of the entire amount owed Forsgren for work and materials, Wilshire and Makasa should not be required to pay the entire amount of interest on the mechanic's lien claim. In addition, there was no stipulation to the portion of the value of the work done on Wilshire and Makasa's adjacent property.

There was thus no liquidated claim from which interest could be calculated. Section 3287 prescribes an award of interest where damages are "certain, or capable of being made certain by calculation." (§ 3287, subd. (a).) We thus conclude the trial court erred in ordering Wilshire and Makasa to pay interest based on the entire mechanic's lien and stipulated value of Forsgren's work and labor provided.

Because the award of prejudgment and postjudgment interest must be reversed, Forsgren's cross-appeal is moot.

## 4. Disposition

The judgment is reversed. In the event of retrial, the trial court is directed to determine, consistent with this decision, what portion of Wilshire and Makasa's adjacent property was required for the convenient use and occupation of the golf course and flood channel. Forsgren is awarded its costs on appeal.

Hollenhorst, Acting P. J., and Richli, J., concurred.

The petition of appellant Forsgren Associates, Inc., for review by the Supreme Court was denied June 17, 2010, S181543.